784 A.2d 31

Vivian Mae HICKMAN, Personal Representative
of the Estate of Louis J. HICKMAN, et al.

v.

Thomas J. CARVEN, et ux.

No. 12, Sept. Term, 2001.

Court of Appeals of Maryland.

Nov. 5, 2001.

James W. Almand (Christopher A. Palmer of Ayres, Jenkins, Gordy & Almand, P.A., on brief), Ocean City, for petitioners/cross-respondents.

Harold Douglas Norton (Brown, Brown & Brown, P.A., on brief), Bel Air, for respondents/cross-petitioners.

Argued Before BELL, C.J., and ELDRIDGE, RAKER, WILNER, HARRELL, BATTAGLIA, and ROBERT L. KARWACKI (retired, specially assigned), JJ.

WILNER, Judge.

Maryland Code, § 5–108(a) of the Courts and Judicial Proceedings Article provides, in relevant part, that no cause of action for damages accrues when "personal injury, or injury to real or personal property resulting from the defective and unsafe condition of an improvement to real property occurs more than 20 years after the date the entire improvement first becomes available for its intended use." We have regarded that statute as one of repose and not one of limitations. *See Rose v. Fox Pool*, 335 Md. 351, 643 A.2d 906 (1994).

The general issue before us in this case is whether the statute applies to an action by the owners of a residential subdivision lot against the developers of the subdivision for alleged personal and economic injury accruing from the developers' concealment of a burial ground on the plaintiffs' lot. That issue hinges on whether the injuries alleged by the plaintiffs result from the "defective and unsafe condition of an

improvement" to the property. The Circuit Court for Worcester County answered that question in the affirmative, concluded as a result that the statute applied, and, upon a finding that the action was not brought within the 20–year period allowed by the statute, entered summary judgment for the defendant-developers. The Court of Special Appeals, holding that the plaintiffs' claims did not involve injuries resulting from a defective and unsafe condition of an improvement to real property, reversed. *Carven v. Hickman,* 135 Md.App. 645, 662–63, 763 A.2d 1207, 1217 (2000). We shall affirm the judgment of the Court of Special Appeals.

## BACKGROUND

The underlying facts relevant to this appeal are not in dispute and, indeed, have been presented to us through an agreed statement.

In February, 1944, Louis Hickman acquired a 200 acre farm in Bishopville, on which he created a 150–lot residential subdivision known as Holiday Harbor. The property was subdivided through the recording of a number of plats, the first of which was recorded in February, 1960. The plat which concerns us is the second one, placed on record in June, 1964. One of the lots on that plat is Lot 96. In furtherance of the Holiday Harbor development, Hickman built roads and canals, installed underground electric service, and granted rights of way for other utilities and roads. In June, 1960, Hickman imposed a set of restrictive covenants on the lots, included in which was a covenant prohibiting any "graveyard" from being maintained or operated on any portion of the subdivision. Hickman retained the right, along with other lot owners, to enforce the covenants, and he retained the right to approve plans for any construction on the lots.

In 1975, Hickman conveyed Lot 96 to the Tubbs. In 1984, the Tubbs conveyed the lot to the Bryants, and in April, 1986, the Bryants conveyed it to the Carvens, the present owners. After acquiring the lot, the Carvens met with Hickman, who approved their plans for the construction of a residence.

Hickman said nothing about there being a graveyard on the lot; nor was the existence of a graveyard indicated on the recorded plat. With their plans approved, the Carvens built a home on the lot in 1986. Hickman died in September, 1997.

In December, 1997, the Carvens filed suit against Hickman's widow, Vivian Hickman, whom they alleged was a co-owner and co-developer of Holiday Harbor with her husband. The complaint alleged deceit, breach of the covenant of special warranties, and negligence, all based on the assertions that (1) the Hickmans were general partners in the development and sale of the lots; (2) they knew or should have known of the existence of a graveyard located on the farm and on Lot 96 in particular; (3) during the development, memorial markers and all other indicia of the existence of the graveyard were removed by the Hickmans or their agents; (4) the graveyard constitutes a dangerous and hazardous condition and is a latent defect, a defect in title, and a defect in fact; (5) although the Hickmans knew or should have known of the existence of the graveyard, they failed to disclose its existence to persons entitled to knowledge; (6) the Carvens discovered the existence of the graveyard on Lot 96 in January, 1995; and (7) the Carvens purchased Lot 96, built their home on it, relocated from their previous residence, and mortgaged the property as security for loans in justifiable reliance on the fact that the property was free of hazards and defects, and they would not have done so had the existence of the graveyard been disclosed to them.

With respect to their claim for deceit, the Carvens asserted that the omission by the Hickmans to disclose on the recorded plat the existence of the graveyard constituted a knowingly false representation of a material fact, that the Hickmans intended that grantees would rely on the plat, which failed to disclose the graveyard, and that the Carvens justifiably relied on that plat. The breach of warranty claim was founded on the restrictive covenant prohibiting the maintenance of a graveyard which, the Carvens asserted, was specially warranted in the deed to Lot 96. The action for negligence was based on averments that the Hickmans held themselves out to the

public as professionals engaged in the development of the farm and Lot 96, and that they breached their duty to use reasonable care in developing the property by failing to remove the graveyard or disclose its existence. They contended that, as a result of the graveyard, (1) their property is "worthless," (2) the loan secured by the property is subject to acceleration by reason of the failure of security, (3) they will be required to incur substantial costs in having the bodies interred on their property relocated, restoring the surrounding yard, and obtaining other living arrangements during the restoration, and (4) they have suffered mental anguish and emotional distress.

Ms. Hickman moved for summary judgment on a number of substantive and procedural grounds, including a claim that the Carvens' action was barred by § 5–108. It is agreed in this appeal that, based on the evidence submitted by the Carvens in opposition to the motion, a jury could find that (1) there *is* a graveyard on the Carvens' lot; (2) it may contain the graves of members of the Beauchamp and Hickman families;[1] (3) Louis Hickman knew of the existence and location of the graveyard; (4) by reason of his prior experience as a Worcester County Commissioner and the discovery of graves during the development of the Ocean Pines Community, Hickman had reason to know the expense associated with the disinterment and relocation of graveyards; (5) Hickman removed the tombstones, markers, and other surface evidence of the graveyard with the use of a bulldozer, while leaving the graves underground; (6) none of the documents submitted to the county by the Hickmans show any indication of the existence of a graveyard; and (7) the county health department, which approved Plat No. 2, would not have done so if it had known that any portion of Lot 96 contained a graveyard.

--------

1. Much of the evidence regarding the graveyard came from the testimony of elderly residents of the area who recalled working or playing in the vicinity of the graveyard. It appears that the owners of the erstwhile farm buried their relatives there, as was common practice among farmers of an earlier day. There was testimony that burials began there in the 1850's and may have continued through the 1940's.

The Carvens acted as their own general contractor in building their home and performed much of the labor associated with the construction. They or persons acting for them installed a continuous footer for the home, a septic system, and underground utility lines, they planted trees and shrubs, and they installed other landscaping materials. None of that digging in 1986 revealed evidence of the graveyard. Sometime after October 15, 1994, Ms. Carven was told by some of her business customers that her house was built on a graveyard which Mr. Hickman confirmed. At some later point, she dug a hole in her yard where a yucca plant had been and, about 12 inches below the surface, discovered some bones and a piece of metal that she believed to be a casket handle. Two county sheriff's deputies thereafter discovered additional bones in the same hole.[2]

On this evidence, the Circuit Court initially denied the motion, but, on reconsideration, concluded that § 5–108 applied and that it barred the action. The court concluded that, by creating a subdivision, preparing lots and creating streets and utilities, Hickman enhanced the value of the property and adapted it for new and further purposes, and, as a result, created an "improvement" within the meaning of § 5–108. In light of the fact that the subdivision plat was recorded in June, 1964, and suit was not filed until December, 1997, the court concluded that suit had not been filed within the 20 years specified in the statute. Finally, the court found that the

---

**2.** Deposition testimony by a local funeral director indicated that the use of concrete vaults as coffin receptacles did not become popular until the 1920's, and that, before then, it was common just to place wooden caskets into the ground or to line the grave with bricks. In either event, the caskets and some of the bones deteriorated over time. The witness said that, at Ms. Carven's request, he probed for graves at her home and discovered lining bricks under the front lawn at a depth of one to two feet. He also found some hollow spaces at a depth of two feet, which he attributed to the disintegration of caskets. The witness debunked the myth that caskets are buried six feet below ground level. He said that one digs until just above water level, which on the Eastern Shore is quite high, and that the top of the casket is often a foot or two under ground.

alleged fraudulent concealment on the part of the Hickmans would not preclude application of the statute.

As indicated, the Court of Special Appeals reversed. Although acknowledging that the digging of canals and the building of roads and installation of utilities may qualify as improvements, the court noted that the Carvens were not contending that they suffered any injury from the defective and unsafe condition of those improvements. The change at issue here was the removal of headstones from a graveyard to conceal its existence, and that, the court held, was not an improvement. It did not alter the status of the property but merely concealed that status. Even if that activity were regarded as an improvement, the court concluded that the improvement was not a "defective and unsafe" condition. The only possible defective and unsafe condition, the court continued, would be the existence of the graves, but there is nothing defective or unsafe about a graveyard containing graves. Finally, the intermediate appellate court found that the injuries alleged by the Carvens were not the type intended to be covered by the statute—that "[t]he diminution in the value of a residential property caused by the discovery of the presence of a cemetery on that property and the cost of disinterring the bodies of that graveyard are not the injury to personal or real property, or personal injury, contemplated by the Maryland statute of repose." *Carven v. Hickman, supra,* 135 Md.App. at 662, 763 A.2d at 1216.

## DISCUSSION

As we observed, § 5–108(a) precludes a cause of action for personal injury or injury to real or personal property that results from the defective and unsafe condition of an improvement to real property when the injury occurs more than 20 years after the date the entire improvement first became available for its intended use. In the context of this case, three issues are presented: (1) what is the relevant improvement; (2) what evidence has been presented that the improvement is defective and unsafe; and (3) to what extent are the

injuries claimed by the plaintiffs attributable to the defective and unsafe condition of the improvement?

The principal dispute between the parties centers on the first issue—the improvement. The Carvens maintain that the Hickmans made no improvement to their property, and for that reason alone the statute does not apply. They view Hickman's conduct as nothing more or less than unlawful graveyard desecration—the removal of monuments and markers that served only to conceal the undisturbed remains lying underneath. That, they contend, is what produced the injuries of which they complain, but it does not constitute an "improvement" to their land. Hickman takes a somewhat broader, or extended, view of the term "improvement." The removal of the monuments and markers cannot be viewed in isolation, she urges. It was part of the grading and development of the entire 200–acre tract. That grading, she avers, together with the building of roads and canals and the installation of utility lines, constitutes an improvement that extends to Lot 96, and, because the removal of the monuments and markers was part of that improvement, it partakes the status of an improvement itself.

In *Rose v. Fox Pool, supra,* 335 Md. 351, 375, 643 A.2d 906, 918, we observed that § 5–108 did not define the term "improvement to real property" and that there was no clear indication in the legislative history of what the Legislature intended the term to mean. Citing an analysis by the Court of Special Appeals in *Allentown Plaza v. Suburban Propane,* 43 Md.App. 337, 405 A.2d 326 (1979), we noted that, in other States with similar statutes, the courts had taken two different approaches in defining that term—the "fixture" approach, which looks to whether the item in question has become so attached to the land that, under a common law fixture analysis, it has become a fixture upon the land, and what the *Allentown Plaza* court and we in *Rose* regarded as a "common sense" or "common usage" approach. *Rose,* 335 Md. at 375–76, 643 A.2d at 918. The latter, which represents the majority rule around the country, looks to the common sense meaning of the word "improvement."

In *Allentown Plaza,* the Court of Special Appeals indicated that, under the majority view, the term "improvement" may include " 'everything that permanently enhances the value of premises for general uses.' " *Allentown Plaza, supra,* 43 Md.App. at 345, 405 A.2d at 331 (quoting 41 AM.JUR.2D *Improvements* § 1, at 479 (1968)). We regarded that definition as too broad and adopted, instead, the definition given in *Black's Law Dictionary* 757 (6th ed.1990), namely:

"[a] valuable addition made to property (usually real estate) or an amelioration in its condition, amounting to more than mere repairs or replacement, costing labor or capital, and intended to enhance its value, beauty or utility or to adapt it for new or further purposes. Generally has reference to buildings, but may also include any permanent structure or other development, such as a street, sidewalks, sewers, utilities, etc. An expenditure to extend the useful life of an asset or to improve its performance over that of the original asset. Such expenditures are capitalized as part of the asset's cost."

*Rose,* 335 Md. at 376, 643 A.2d at 918.

Under this definition, there can be no doubt but that the subdivision of the 200–acre farm through the recording of subdivision plats, the building of streets and canals, and the installation of utilities constituted improvements to the tract and to that part of the tract that became Lot 96. As noted, however, the injuries alleged by the Carvens do not arise from any of those improvements. They are not complaining about the roads, canals, or utilities.

■. Here, the Carvens complaint relates solely to the graveyard found on Lot 96. Under our definition, developing or using land for a graveyard may also constitute an improvement, in that a graveyard may enhance the value, beauty, or utility of vacant land. But the Hickmans did not create or extend the graveyard, so it could not be regarded as an improvement they created. The conduct at issue is the desecration of the existing graveyard—the removal of monuments, markers, and other evidence denoting the existence of the

graveyard, which effectively concealed the existence of the graveyard. *That,* the Carvens maintain, cannot constitute an improvement to the land.

"A place for the burial of the dead," we said in *Abell v. Green Mount Cemetery,* 189 Md. 363, 366, 56 A.2d 24, 25 (1947), "has characteristics differing from those of an ordinary tract of land. To many it is sacred ground which should not suffer intrusion from mundane objects." *See also Diffendall v. Diffendall,* 239 Md. 32, 36, 209 A.2d 914, 915–16 (1965) ("[T]hrough the ages, all civilized peoples have considered the final resting place of their dead as hallowed and sacred ground."). In furtherance of that notion, the Legislature has enacted a host of laws protective of burial grounds, laws that limit what may be done with and on them. The General Assembly has made it a crime (1) to remove or attempt to remove human remains from a graveyard, absent permission from the local State's Attorney, Maryland Code, Art. 27, § 265, (2) willfully to destroy, mutilate, deface, injure, or remove any tomb, monument, gravestone, or other structure placed in a cemetery, *id.* § 267, (3) willfully to destroy or remove any tree, plant, or shrub in a cemetery, *id.,* or (4) to engage in indecent or disorderly conduct within a cemetery, *id.* It has required that anyone seeking to disinter a body obtain a permit from the State Department of Health and Mental Hygiene. Maryland Code, § 4–215(e)(1) of the Health–General Article.

The Legislature has enacted extensive regulations on the use and operation of land used for burial, Maryland Code, §§ 5–101 through 5–1002 of the Business Regulations Article, and has empowered the State's municipalities to regulate the interment of bodies and control the location and establishment of cemeteries. Maryland Code, Art. 23A, § 2(b)(6). As part of its direct statutory regulation, the Legislature has precluded the opening of alleys, canals, roads, or other public thoroughfares through the property of a cemetery if that property is used for burial. Maryland Code, Business Regulations Article, § 5–502(a). It has also provided for, and perhaps requires, a court judgment prior to the sale of a burial ground.

Section 5–505(a) of the Business Regulations Article provides that, in an action brought pursuant to the Maryland Rules, a court may enter a judgment for the sale of a burial ground if the ground has been dedicated and used for burial, burial lots have been sold in the burial ground and deeds executed or certificates issued to buyers, the ground has ceased to be used for burial, and it is desirable to dispose of the burial ground for another purpose. In that event, if the court is satisfied that it is expedient or would be in the interest of the parties to sell the burial ground, the court is authorized to enter a judgment for the same "on the terms and notice the court sets." *Id.* § 5–505(b)(1). The law requires, however, that the court order "as much of the proceeds of the sale as necessary be used to pay the expenses of removing any human remains in the burial ground, buying burial lots in another burial ground, and reburying the remains." *Id.* § 5–505(b)(2). *See also* Maryland Rule 14–401. A judgment entered under § 5–505 passes title to the burial ground free of the claims of the owners of the burial ground and the holders of burial lots. Maryland Code, Business Regulations Article, § 5–505(c). Absent such a judgment, it may well be that a deed to land that constitutes a burial ground does *not* pass title free of such claims.

In addition to these statutes, the Legislature has given interested persons—those related by blood or marriage to a person interred in a burial site and those having a "cultural affiliation" with such a person—the right to request access to the burial site of the owner of the site or of the land containing the site. Maryland Code, § 14–121(b) of the Real Property Article.

■ It is evident from these statutes—some or all of which may apply here—that significant limitations have been placed on what may be done with land containing burial sites. Although those impediments do not preclude the positive development of land for use as a graveyard from being regarded as an improvement, they clearly preclude the desecration and consequent concealment of an existing graveyard from being

considered an improvement. It hardly comports with a common sense approach to suggest that such conduct, when undertaken as part of the subdivision of land for *residential* purposes—for the sale of relatively small lots, approximately one-third acre in size, to persons intending to use them to construct homes—constitutes an improvement of the land. In that setting, such desecration and concealment do not enhance the value of the land but detract from that value; apart from any personal reluctance to live on top of burial sites with human remains resting barely two feet below ground, it places limitations and potential obligations on the buyers that they would not expect, or desire, for residential property. Under no stretch of the imagination can Lot 96 be said to have been improved by Hickman's alleged concealment of the burial sites. The concealment may have allowed Hickman to sell the land at a higher price, or without the impediments established by law, but that is not what we believe the Legislature intended to regard as an improvement.

■ We turn, then, to the thrust of Hickman's argument, that, even if the desecration and concealment may not be regarded, themselves, as an improvement, they were part of the overall grading and construction work and thus constitute a component of an improvement. Other States, she avers, have ruled that components of an improvement to real property are encompassed by statutes of repose. The desecration, she contends, was part of the construction process that resulted in the creation of the subdivision and, absent the removal of the headstones and markers, Lot 96 could not have become a residential home site.

There are, indeed, cases holding that where construction work has occurred that suffices as an improvement, work or items that constitute integral components of that construction activity partake of that improvement status, and that an action based on some defect in the component item is subject to the statute of repose. *See*, for example, *Lederman v. Cragun's Pine Beach Resort*, 247 F.3d 812 (8th Cir.2001). As part of a major construction project, the contractor built a temporary

trench in which to relocate a communications cable that had to be lowered to accommodate the new facility. *Lederman,* 247 F.3d at 814. Once the cable was placed in the trench, the trench would be refilled. The plaintiff, injured while walking on a path adjoining the trench when the trench caved in, sued the owner and contractor for negligence. The issue, for purposes of the relevant (Minnesota) six-year statute of repose, was whether the temporary trench qualified as an improvement. The court held that it was, because, although temporary in nature, it was an integral part of the overall project, which clearly constituted an improvement. *Id.* at 816.

*See also Two Denver Highlands Ltd. v. Dillingham Constr.,* 932 P.2d 827, 830 (Colo.Ct.App.1996) (finding concrete used to build a parking garage as an "essential" part of this improvement); *Travelers Ins. Co. v. Guardian Alarm Co.,* 231 Mich. App. 473, 586 N.W.2d 760, 762 (1998) (circuit panel box and transformer held to be integral components of electrical system in a plant); *Standard Fire Ins. Co. v. Kent & Assocs.,* 232 Ga.App. 419, 501 S.E.2d 858, 859–60 (1998) (finding an interlock device on a pool's circulating pump starter to be an integral component and therefore a protected improvement); *Kleist v. Metrick Elec. Co.,* 212 Ill.App.3d 738, 156 Ill.Dec. 839, 571 N.E.2d 819, 821–22 (1991) (electrical box within electrical system found to be integral part of larger improvement, and therefore protected); *Hausman v. Monarch Mach. Tool Co.,* 997 F.2d 351, 354–55 (7th Cir.1993) (shear table found to be integral component of metal coil processing system). A rationale for this view, regarding an item as an improvement if it is an integral component of a project that itself would qualify as an improvement, was given in *Hilliard v. Lummus Co.,* 834 F.2d 1352, 1356 (7th Cir.1987) (quoting *Mullis v. Southern Co. Servs., Inc.,* 250 Ga. 90, 296 S.E.2d 579, 584 (1982)):

> "[T]o artificially extract each component from an improvement to real property and view it in isolation would be an unrealistic and impractical method of determining what is an improvement to real property.... We find that if a component is an essential or integral part of the improve-

ment to which it belongs, then it is itself an improvement to real property."

For purposes of this case, we accept the doctrine of regarding items or work that are an integral component part of a larger improvement as within the ambit of § 5–108(a). Acceptance of that doctrine does not assist Hickman in this case, however, for the doctrine has its own limits. Although it may well be that Hickman removed the tombstones and other graveyard markers contemporaneously with and during the course of grading the land or building roads or canals, or preparing the land for utilities, the removal of those objects cannot reasonably be said to be an integral component part of the grading, or building, or preparation. It was not necessary to the grading, building, or preparation and was, in fact, unlawful and prohibited.

Accordingly, we hold that the desecration and concealment of the grave sites by Hickman does not constitute an improvement to real property for purposes of § 5–108(a). As the injuries claimed by the Carvens do not, therefore, result from the defective and unsafe condition of "an improvement to real property," § 5–108(a) does not apply and does not bar this action.

JUDGMENT OF COURT OF SPECIAL APPEALS AFFIRMED, WITH COSTS.