**UNPUBLISHED**

# UNITED STATES COURT OF APPEALS
### FOR THE FOURTH CIRCUIT

LORENA P. PIPPIN, in her capacity as
Guardian and Next Friend of James
Michael Green, Jr., Joshua Lee
Green, and David Matthew Green;
W. SHEPARDSON ABELL, in his
capacity as co-personal
representative of the Estate of
James Michael Green; MARVIN T.
GAITHER, in his capacity as co-
personal representative of the Estate
of James Michael Green,
                    *Plaintiffs-Appellants,*

                v.

REILLY INDUSTRIES, INCORPORATED,
formerly known as Republic
Creosoting Company,
                    *Defendant-Appellee,*

                and                            No. 02-1782

ASPLUNDH TREE EXPERT COMPANY;
POTOMAC ELECTRIC POWER COMPANY,
                    *Defendants,*

                v.

WILLARD PACKAGING COMPANY,
INCORPORATED; RAYMOND W.
SALKELD, JR.; S. L. SALKELD,
                    *Third Party Defendants.*

Appeal from the United States District Court
for the District of Maryland, at Greenbelt.
Alexander Williams, Jr., District Judge.
(CA-98-3236-AW)

Argued: February 27, 2003

Decided: May 29, 2003

Before WILKINS, Chief Judge, MOTZ, Circuit Judge,
and C. Arlen BEAM, Senior Circuit Judge of the
United States Court of Appeals for the Eighth Circuit,
sitting by designation.

Affirmed by unpublished per curiam opinion.

**COUNSEL**

**ARGUED:** Joseph G. Petrosinelli, WILLIAMS & CONNOLLY,
L.L.P., Washington, D.C., for Appellants. Peter Allan Woolson,
ROBINSON WOOLSON, P.A., Baltimore, Maryland, for Appellee.
**ON BRIEF:** Oliver Garcia, Erin E. Brophy, WILLIAMS & CON-
NOLLY, L.L.P., Washington, D.C., for Appellants. Deborah L. Rob-
inson, Brian Mikesh, ROBINSON WOOLSON, P.A., Baltimore,
Maryland, for Appellee.

Unpublished opinions are not binding precedent in this circuit. See
Local Rule 36(c).

**OPINION**

PER CURIAM:

On March 13, 1996, James Green's truck collided at slow speed
with a wooden utility pole which fractured 22 feet above ground, at
the location of a knot in the wood. A 500-pound transformer attached
to the pole fell through the cab of Green's truck, pinning him to the
steering wheel, and ultimately killing him. The representatives of

Green's estate and the court-appointed guardian of his children (collectively "the Estate") brought this action against several parties, including the original designer and manufacturer of the pole, Reilly Industries, Inc., alleging that the knot in the pole rendered it defective, and that this defect caused Green's death.[1] The district court granted summary judgment to Reilly on the ground that Maryland's statute of repose, Md. Code Ann., Courts and Jud. Proceedings § 5-108(a) (2002), barred the Estate's action against Reilly. The Estate appeals, contending that the pole did not constitute an "improvement to real property" within the meaning of the statute of repose. We affirm.

I.

In 1967, Potomac Electric Power Company ("PEPCO") ordered the pole from Reilly (then Republic Creosoting Company). PEPCO installed the pole in an industrial park in Gaithersburg, Maryland in 1968. Three transformers were suspended from the top of the pole, as were electrical wires which ran from an existing pole across the street, down the pole, into an underground trench, and ultimately to a warehouse.

When initially installed, the pole did not facilitate the supply of electricity to the parcel of land on which it was located. The pole was located on Parcel E owned by a Mr. Adams, but was used to provide electricity to a warehouse located on the adjoining Parcel D, owned by Mr. and Mrs. Salkeld. Though there was some dispute on this point at oral argument, the only reasonable reading of the record indicates that at the time PEPCO installed the pole on Parcel E, that parcel was undeveloped. After the pole was installed, apparently two buildings were built on Parcel E and Adams had sold the parcel to a Mr. Kimmel.[2]

---

[1]The Estate also sued the owner of the property on which the pole was located, the owner of the pole, and the company responsible for inspecting the pole. Those cases have been resolved and are not before us on appeal.

[2]Dale Salkeld testified in deposition that "we built [the warehouse] in 1968. There was nothing else here;" that the pole was installed in "an open area field;" that the building now on Parcel E "wasn't there" in

Sometime between 1980 and 1989, Kimmel sold a 25-foot right of way to the Salkelds; this right of way included the land on which the pole was located. As the district court put it, "[a]t that point, the utility pole was used to supply power to the parcel of land in which it was attached."

## II.

We review the district court's grant of summary judgment *de novo*, viewing the record in the light most favorable to the nonmoving party, here the Estate. *Bryant v. Bell Atlantic Maryland, Inc.*, 288 F.3d 124, 132 (4th Cir. 2002). Because this is a diversity case, we apply Maryland law. *See* 28 U.S.C.A. § 1652 (West 1994); *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938).

Maryland's statute of repose provides in pertinent part:

> Except as provided by this section, no cause of action for damages accrues and a person may not seek contribution or indemnity for damages incurred when wrongful death, personal injury, or injury to real or personal property resulting from the defective and unsafe condition of an improvement to real property occurs more than 20 years after the date the entire improvement first becomes available for its intended use.

Md. Code Ann., Courts and Jud. Proceedings § 5-108(a).

The district court held that the pole constituted an improvement to real property that had been installed more than 20 years before it was

---

1968; and that the buildings located on Parcel E were built after the pole was installed, when Adams sold the property. Although Dana Salkeld stated that there was an Easy Go building in the area in 1968, it appears that the Easy Go building was on the other side of the street from Parcels D and E. This fact is not *absolutely* clear from the record (because for some reason the parties chose not to include in the record the various deposition exhibits and testimony that dealt with the issue directly) but we believe it is the only reasonable inference that can be drawn from the evidence that is in the record.

hit by Green's truck, and that the statute of repose, therefore, barred the Estate's action against Reilly. The Estate contends that the pole never constituted an "improvement to real property" within the meaning of the statute of repose. Thus, the issue before us is whether the pole was an "improvement to real property" within the meaning of Maryland's statute of repose.

Maryland courts have discussed the meaning of the term "improvement to real property" in the statute of repose on three pertinent occasions. First, in *Allentown Plaza Assocs. v. Suburban Propane Gas Corp.*, 405 A.2d 326 (Md. Ct. Spec. App. 1979), Maryland's intermediate appellate court held that gas meters improperly attached to an underground pipeline system were not an "improvement to real property," under the statute. The court noted that "[i]n determining what constitutes an 'improvement to real property' courts have employed two basic approaches. One applies common law fixture analysis. The other . . . adopts a 'commonsense' interpretation of the phrase." *Id.* at 344-45 (citations omitted). It determined that Maryland courts applied the "commonsense" interpretation, and held that the gas meters did not fall within the commonsense meaning of "improvement to real property." *Id.* at 346-47.

In *Rose v. Fox Pool Corp.*, 643 A.2d 906 (Md. 1994), Maryland's highest court, the Court of Appeals, agreed with the *Allentown* court that Maryland used a "commonsense" interpretation to discern the meaning of "improvement to real property," but the *Rose* court rejected the definition of improvement that had been used by the *Allentown* court. Instead, the *Rose* court found persuasive:

> the narrower definition of "improvement" found in *Black's Law Dictionary*, which several courts have relied upon in construing the term:
>
>> [a] valuable addition made to property (usually real estate) or an amelioration in its condition, amounting to more than mere repairs or replacement, costing labor or capital, and intended to enhance its value, beauty or utility or to adapt it for new or further purposes. Generally has reference to buildings, but may also include any perma-

> nent structure or other development, such as a
> street, sidewalks, sewers, utilities, etc. An expendi-
> ture to extend the useful life of an asset or to
> improve its performance over that of the original
> asset. Such expenditures are capitalized as part of
> the asset's cost.

*Id.* at 918 (citing, *inter alia*, *Black's Law Dictionary* 757 (6th ed.
1990) (hereinafter "*Black's*")). The *Rose* court further explained that
"the nature of the addition or betterment, its permanence and relation-
ship to the land and its occupants, and its effect on the value and use
of the property are factors which common sense dictates should be
considered in making the case by case determination of whether it is
an 'improvement to real property' within the meaning of § 5-108." *Id.*
(citing *Allentown*, 405 A.2d at 332).

Finally, in *Hickman v. Carven*, 784 A.2d 31 (Md. 2001), the Court
of Appeals recently considered again what constitutes an "improve-
ment to real property" under the statute of repose. There, owners of
a residential subdivision lot sued the developers of the subdivision
maintaining that the developers concealed a burial ground on the lot.
The developers contended that removing tombstones from the plot
more than twenty years earlier to develop a larger tract of land consti-
tuted an integral part of an "improvement to real property" and so the
statute of repose barred any damages arising from the removal. The
*Hickman* court "accept[ed] the doctrine of regarding items or work
that are an integral component part of a larger improvement as within
the ambit of § 5-108(a)." *Id.* at 38. However, the court concluded that
"the removal of [tombstones and other graveyard markers] cannot rea-
sonably be said to be an integral component part of the [land develop-
ment.]" *Id.*

On appeal, the Estate contends that these cases support two argu-
ments as to why the pole did not constitute an "improvement to real
property."[3] First, the Estate argues that the pole was not an *essential*

---

[3]The Estate also relies on cases from other jurisdictions that speak to
the issue of whether a utility pole is an "improvement to real property."
We do not find these cases very helpful both because they interpret dif-

*component* of any improvement. Second, the Estate maintains that if the pole was an improvement at all, it was not an improvement to the property on which it was located, and was therefore outside the statutory meaning of "improvement to real property."

A.

Initially, the Estate argues that the pole was not essential to any improvement because PEPCO could have used alternative methods to deliver electricity, such as placing the wires underground. This argument fails, however, because Maryland law does not require that an item be the *only* means of achieving a particular purpose in order to be an essential, or integral component of an improvement.

In *Hickman*, 784 A.2d at 37-38, the Court of Appeals adopted the rule that an "item" is "an improvement if it is an integral component of a project that itself would qualify as an improvement," citing *inter alia*, *Lederman v. Cragun's Pine Beach Resort*, 247 F.3d 812 (8th Cir. 2001), and *Two Denver Highlands Ltd. P'ship v. Dillingham Constr.*, 932 P.2d 827 (Colo. Ct. App. 1996). The *Lederman* court considered a trench that had been dug by a contractor for the purpose of temporarily relocating a communications cable. *Lederman*, 247 F.3d at 814. It held that the trench was an "indispensible part" of the overall project, although nothing suggested that the trench was the only means of relocating the cable. *Id.* at 815. Similarly, the court in

---

ferent statutes and because they reach inconsistent results. *Compare Turner v. Marable-Pirkle, Inc.*, 233 S.E.2d 773, 775 (Ga. 1977) ("The erection of a power pole, and the placing of the necessary equipment thereon, for the transmission of electricity is not such an improvement to real estate as was contemplated by the [Georgia statute of limitations]"); *Johnson v. Steele-Waseca Coop. Elec.*, 469 N.W.2d 517, 519 (Minn. Ct. App. 1991) ("Rather than being an improvement to appellants' property, [an electric pole and transformer] is an addition to respondent's distribution system" under Minnesota law), *with Ebert v. S. Jersey Gas Co.*, 723 A.2d 599, 601 (N.J. 1999) (holding that a gas line, although a conduit, also is a valuable improvement under New Jersey law); *Mora-San Miguel Elec. Coop. v. Hicks & Ragland Consulting & Eng'g Co.*, 598 P.2d 218, 220 (N.M. Ct. App. 1979) (holding that installation of a power line is a physical improvement under New Mexico law).

*Two Denver Highlands* held that the concrete used to build a parking garage was an "essential" component of the improvement, notwithstanding the fact that the parking garage could surely have been built out of other material. *Two Denver Highlands*, 932 P.2d at 830; *see also Ebert*, 723 A.2d at 601 ("The availability of another form of energy, as valuable as it may be, does not prevent a gas line from being an improvement."). Thus, as these cases make clear, the existence of a substitute for a component does not necessarily render that component non-integral.

In this case, the pole was integral to provision of electricity because the electrical wires and transformers, like the communications cable in *Lederman*, had to be located out of harm's way. To be sure, use of the pole does not constitute the sole means by which this could be achieved, but it certainly constituted an ordinary and reasonable means to do this. Once it was determined that the wires and tranformers were to be suspended above the ground, the pole was essential, allowing passage on the roadway below and reducing the risk of electrocution to people on the ground.

### B.

Second, the Estate argues that the pole was not an improvement to the property *on which it was installed*, and was therefore outside the statutory meaning of "improvement to real property." This argument founders on its premise — that the pole was not an improvement to the property on which it was installed.

In elaborating on the "commonsense" meaning of "improvement to real property," the *Rose* court referred to the *Black's* definition of "improvement." *Rose*, 643 A.2d at 918. *Black's* defines an "improvement" as

> [a] valuable addition made to property (usually real estate) or an amelioration in its condition, amounting to more than mere repairs or replacement, costing labor or capital, and intended *to enhance its* value, beauty or *utility or to adapt it for new or further purposes*. Generally has reference to buildings, but may also include any permanent structure or

other development, such as a street, sidewalks, sewers, utili-
ties, etc. . . .

*Id.* (emphasis added) (citing *Black's* at 757).

Relying on this definition, the district court believed that "[t]he
utility pole is practically in Black's Law Dictionary as an improve-
ment to real property." Given our earlier determination that the pole
was an essential component to the provision of electricity, we agree
that the pole clearly would be an "improvement to real property"
under the Maryland statute of repose if, when installed, the pole had
been used to provide electricity to the property on which it was
located. In such circumstances, the installation of the pole would
clearly "enhance . . . [the] utility" of the property. This case, however,
is complicated by the fact that the pole was *not* used to provide elec-
tricity to the land on which it was located until Kimmel sold the 25-
foot right of way to the Salkelds sometime between 1980 and 1989
— less than 20 years before Green's accident.

If, for this reason, the pole cannot be regarded as "enhanc[ing] . . .
[the] utility" of the property on which it was located for the requisite
twenty years, we believe it nonetheless constituted an improvement
to that property under another portion of the *Black's* definition. That
is, from the time the pole was installed (and therefore more than
twenty years), it constituted an addition to the property on which it
was installed that was "intended . . . to adapt it for new or further pur-
poses." *Black's* at 757.

The evidence demonstrates that the pole was installed in an empty
field, on a parcel of land that was theretofore undeveloped. Today, the
area is a fully developed industrial park. There can be no doubt that
this development would not have occurred if electricity had not been
provided to the area. Although no building existed on Parcel E at the
time the pole was installed — and there was therefore no need for
electricity on that parcel — the installation of the pole facilitated the
future development of that land by providing a source of electricity
for the future. Thus, even at the time it was installed, the pole consti-
tuted an improvement to the land on which it was located, Parcel E,
because the pole was "intended . . . to adapt it for new or further pur-
poses," *id.*, by facilitating the provision of electricity to any future

development on Parcel E. Furthermore, it is likely that the easy access to electricity offered by the pole also "enhanced . . . the value" of Parcel E, another component of *Black's* definition of improvement. *Id.*

### III.

In sum, because the pole at issue here constituted an "improvement to real property" within the meaning of Maryland's statute of repose, the district court correctly ruled that the statute barred the Estate's claim against Reilly. Accordingly, the judgment of the district court is

*AFFIRMED.*