*Housing Opportunities Commission of Montgomery County v. Olusegun Adebayo, et al.*,
No. 1488, September Term 2021.  Opinion by Arthur, J.

**BUSINESS REGULATION—SALE OF BURIAL GROUND FOR ANOTHER PURPOSE**

Maryland Code (1992, 2015 Repl. Vol.), § 5-505 of the Business Regulation Article
("BR") establishes a procedure through which a person may obtain court approval of the
sale of certain types of burial grounds "for another purpose," free and clear of the claims
of the owner of the burial ground and the holders of burial lots.  This provision operates
as a quiet-title statute.  If the proponent of a sale does not employ BR § 5-505, a sale can
still occur, but the purchaser will take the property subject to the claims of the lot holders.

In this case, the prospective seller of a property that contained a burial ground was not
required to seek court approval under BR § 5-505 before selling the property.  The
consequence of the failure to employ the statute is that the purchaser would take the
property subject to the claims of the lot holders.

**MOOTNESS—EXCEPTION FOR ISSUES CAPABLE OF REPETITION YET EVADING REVIEW**

This action to enjoin the sale of a property and to compel the seller to obtain court
approval for the sale became moot when the purchaser terminated the sale agreement.
Once the purchaser withdrew from the agreement, there was no longer a sale for the court
to enjoin; nor was there a sale to submit for court approval.

Even though the appeal was moot, the court could decide the appeal under the exception
for cases presenting recurring matters of public concern which, unless decided, will
continue to evade review.  The issue here was likely to recur; was likely to evade review;
involved a relationship between government and its citizens, or a duty of government;
and the public interest would be harmed if the court did not decide the issue.

**STANDING—ACTION CHALLENGING SALE OF BURIAL GROUND**

Individual plaintiffs had standing to bring action to compel seller to seek court approval
for the sale of a burial ground.  The plaintiffs were "person[s] in interest" to an action for
court approval of the sale, as long as the plaintiffs were related by blood or marriage to
persons buried in the cemetery.  To establish standing, the plaintiffs were not required to
produce certificates or deeds for the burial lots.  The plaintiffs produced sufficient
evidence showing a likelihood that their ancestors still were interred in the property.

Circuit Court for Montgomery County
Case No. 486734V

REPORTED

IN THE APPELLATE COURT

OF MARYLAND*

No. 1488

September Term, 2021

_____

HOUSING OPPORTUNITIES COMMISSION OF
MONTGOMERY COUNTY

v.

OLUSEGUN ADEBAYO, ET AL.

_____

Berger,
Arthur,
Kenney, James A., III
    (Senior Judge, Specially Assigned),

JJ.**

_____

Opinion by Arthur, J.

_____

Filed: June 28, 2023

**Tang, J., and Albright, J., did not participate in the Court's decision to designate this opinion for publication pursuant to Md. Rule 8-605.1.

Pursuant to the Maryland Uniform Electronic Legal Materials Act (§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Gregory Hilton, Clerk

*At the November 8, 2022, general election, the voters of Maryland ratified a constitutional amendment changing the name of the Court of Special Appeals of Maryland to the Appellate Court of Maryland. The name change took effect on December 14, 2022.

This is an emotional case about a dry and technical statute: section 5-505 of the Business Regulation Article ("BR") of the Maryland Code (1992, 2015 Repl. Vol.).

Section 5-505 provides, in full, as follows:

(a) An action may be brought in accordance with the Maryland Rules and a court may pass a judgment for sale of a burial ground for another purpose if:

      (1) the ground has been dedicated and used for burial;

      (2) burial lots have been sold in the burial ground and deeds executed or certificates issued to buyers of the lots;

      (3) the ground has ceased to be used for burial; and

      (4) it is desirable to dispose of the burial ground for another purpose.

(b) If the court is satisfied that it is expedient or would be in the interest of the parties to sell the burial ground, the court:

      (1) may pass a judgment for the sale of the burial ground on the terms and notice the court sets;

      (2) shall order that as much of the proceeds of the sale as necessary be used to pay the expenses of removing any human remains in the burial ground, buying burial lots in another burial ground, and reburying the remains; and

      (3) shall distribute the remaining proceeds of the sale among the parties according to their interests.

(c) A judgment for the sale of a burial ground passes to the buyer of the burial ground the title to the burial ground free of the claims of:

      (1) the owners of the burial ground; and

      (2) the holders of burial lots.

In essence, BR § 5-505 is a quiet-title statute: it creates a mechanism by which a person may obtain court approval to sell certain types of burial grounds "for another

purpose," free of the claims of the owner of the burial ground and the holders of the burial lots. An action under BR § 5-505 is usually brought by the owner of the burial ground,[1] but it apparently can be brought by others as well, because the statute empowers the court to enter a judgment that passes the ground to the buyer free of the owner's claims. The statute does not apply to the sale of all burial grounds, but only to those for which burial lots have been sold and deeds executed or certificates issued to buyers of the lots.[2] The statute applies in every jurisdiction in the State, except for Baltimore City, which has its own, similar statute concerning the sale of certain burial grounds for another purpose: BR § 5-506.

The burial ground in this case lies on what is variously referred to as parcel 175 or lot 175 in Bethesda. Since the late 1960s, the parcel or lot in question has been paved over and used as the parking lot of Westwood Tower, a 212-unit apartment building.

In 2018, Westwood Tower was acquired by the Housing Opportunities Commission of Montgomery County ("HOC"), the appellant in this Court and the defendant below. HOC describes itself as a quasi-governmental organization that provides housing for low- and moderate-income families in Montgomery County.

---

[1] *See, e.g.*, *Reed v. Stouffer*, 56 Md. 236 (1881); *Partridge v. First Indep. Church*, 39 Md. 631 (1874).

[2] Thus, the statute would probably not apply to the sale of family cemeteries or private cemeteries associated with convents, monasteries, prisons, orphanages, or other similar institutions, or a potter's field.

The appellees in this Court (the plaintiffs below) are the Reverend Olusegun Adebayo, the pastor and spiritual leader of Macedonia Baptist Church, which is directly across the street from the burial ground; the Bethesda African American Cemetery Coalition, a non-profit organization whose mission is to stop the desecration of the burial ground and to ensure that it is properly memorialized and treated with dignity; and three persons whose ancestors were interred in the burial ground—Darold Cuba, Geneva Nanette Hunter, and Montani Wallace. We shall refer to the appellees, collectively, as the "Coalition," except when referring to one or more of them individually.

In 2021, the Coalition filed suit against HOC in the Circuit Court for Montgomery County. In that suit, the Coalition sought a preliminary injunction to halt the sale of the burial ground to a third-party developer. The Coalition also sought a writ of mandamus to compel HOC to seek court approval under BR § 5-505 before it sold or offered to sell the property to a third party. The central issue before the court was whether BR § 5-505 required HOC to obtain court approval for the sale.

The circuit court granted a preliminary injunction prohibiting HOC from proceeding with the contemplated sale of the property pending a decision on the request for a writ of mandamus. Later, the court issued a writ of mandamus requiring HOC to "comply with [BR § 5-505] prior to selling Westwood Tower Apartments and parcel 175." HOC appealed.

For the reasons detailed below, we shall reverse the judgment. BR § 5-505 establishes a process by which a person may obtain a court order that allows for the sale of a specific type of burial ground free and clear of certain claims, including those of the

3

lot holders and those claiming under them. If a person fails to pursue that process, the property may still be sold, but it remains subject to the claims that a judgment under BR § 5-505 would have extinguished.

### FACTUAL AND PROCEDURAL BACKGROUND

In 1910, a community cemetery, called "Moses African Cemetery," was formed on a hill in Bethesda. The cemetery included what is now known as parcel 175.

In 1911, White's Tabernacle No. 39, a fraternal society that supported the African American community near Fort Reno in the District of Columbia, purchased lots 175 and 177. Pursuant to an Act of Congress, the remains of as many as 192 persons were removed from a burial site in Tenleytown in the District of Columbia and reinterred at the Moses Cemetery. The remains of others were interred at the cemetery in the ensuing decades. The last burial reportedly occurred in the 1940s.

Harvey Mathews, a Black man who grew up 200 yards from the cemetery, played in the cemetery as a child because the public parks were off limits then to Black people. He recalled that the cemetery contained at least 200 graves.

In 1958, the representatives of White's Tabernacle No. 39 sold parcel 175 to one Leo Furr. The tax records accompanying that sale state that the land was "used as a burial ground."[3]

---

[3] The records pertaining to the sale do not appear to be part of the record. Consequently, it is unclear how much the representatives of White's Tabernacle No. 39 received for the property or what they did with the sale proceeds. There is, however, no evidence that they or the purchaser invoked the procedures under BR § 5-505's statutory predecessor and sought court approval for the sale of a burial ground for another purpose.

4

The Westwood Tower apartment building was constructed between 1966 and 1968. The developer was reported to have believed that paving the cemetery "was the best way to keep any human remains in place." He is said to have directed that the drainage be designed so that erosion would not uncover human remains.[4]

In about 1969, a portion of parcel 175 was bulldozed for the construction of a parking lot. Mr. Mathews recalled that the construction workers pushed grave markers into a creek and that they would sometimes uncover human body parts, which they removed to another location. Although Maryland law required[5] (and still requires)[6] a person to obtain permission from the State's Attorney before removing human remains from a burial site, the record contains nothing to suggest that anyone obtained such permission at that time.

HOC began to lease the Westwood Tower property in 1997. The lease gave HOC the option to acquire the property.

In 2013, an entity known as Equity One acquired Westwood Tower. In August of 2016, Equity One submitted a preliminary application to redevelop the property (a "sketch plan application") to the Montgomery County Planning Department.

---

[4] The assertions about the developer's beliefs and statements involve multiple levels of hearsay. At the trial in this case, they were admitted not for the truth of the matters asserted, but as facts or data on which an expert in a particular field—here, an archeologist—would reasonably rely in rendering an opinion. *See* Md. Rule 5-703(a).

[5] Maryland Code (1957), art. 27, § 265.

[6] Maryland Code (2002, 2021 Repl. Vol.), § 10-402 of the Criminal Law Article.

As a result of a public outcry about the potential existence of a cemetery on the property, Equity One and the Montgomery County Planning Department commissioned and funded a historical and archeological study of the cemetery site. The study, which is dated July 21, 2017, concluded that the property had been used as a burial ground for many years.

Meanwhile, an entity known as Regency Centers acquired all of Equity One's holdings, including Westwood Tower. In 2018, HOC exercised its option to acquire Westwood Tower, including parcel 175, from Regency Centers. HOC paid $20 million.

On July 12, 2021, HOC entered into a contract to sell Westwood Tower, including parcel 175, for more than $51 million, to Charger Ventures Bethesda LLC. The contract required Charger to make millions of dollars of capital improvements to the property and to set aside 30 percent of the units for low- and moderate-income families for 99 years. The contract also contained the following provision:

> After Closing, Purchaser shall use its commercially reasonable efforts and shall work in good faith to memorialize the historical significance of the land formerly owned by White's Tabernacle No. 39 (which is sometimes referred to as Moses Cemetery on River Road, River Road Cemetery, or Moses Cemetery), located on or below a portion of the Real Property.

On August 10, 2021, the Coalition filed this suit against HOC. In a one-count complaint, the Coalition asked the court to issue a writ of mandamus "compelling" HOC

6

to file an action pursuant to BR § 5-505 "before selling or offering for sale Parcel 175 for the purpose of using or developing it for a non-burial ground use."[7]

On September 1, 2021, the Coalition moved for a temporary restraining order and preliminary injunction to prevent HOC from completing the sale to Charger until the court had decided the merits of the case. The court granted a temporary restraining order and scheduled a hearing on the motion for a preliminary injunction.

On September 7, 2021, HOC moved to dismiss the complaint. In its motion, HOC principally argued that BR § 5-505 did not impose a mandatory duty of the sort that a court could enforce by a writ of mandamus. HOC also argued that the property was not being sold "for another purpose" within the meaning of BR § 5-505, because it would continue to be used as an apartment building and parking lot. In addition, HOC argued that none of the plaintiffs had standing and that the Coalition had failed to plead that the property contained a burial site.

---

[7] "[C]ommon law mandamus is 'an extraordinary remedy' that 'is generally used to compel inferior tribunals, public officials or administrative agencies to perform their function, or perform some particular duty imposed upon them which in its nature is imperative and to the performance of which the party applying for the writ has a clear legal right.'" *Falls Rd. Cmty. Ass'n, Inc. v. Baltimore County*, 437 Md. 115, 139 (2014). It is questionable whether mandamus is an appropriate remedy in this case, as the alleged duty to be compelled—the duty to seek court approval for the sale of a burial ground in accordance with BR § 5-505—is not one that is imposed upon HOC in its capacity as a governmental or quasi-governmental entity. Rather, the duty to be compelled is one that is allegedly imposed upon anyone who sells a certain kind of burial ground for another purpose, regardless of whether they are or are not a governmental entity. Nonetheless, as HOC did not raise this issue, we do not consider it.

In response to the motion to dismiss, the Coalition relied on Md. Rule 14-401(b), which dictates the procedure for commencing an action for court approval of a burial ground for another purpose under BR § 5-505. Rule 14-401(b) begins by stating that "[t]he action for sale of a burial ground shall be commenced by filing a complaint that, in addition to complying with Rules 2-303 through 2-305" and goes on to dictate what the complaint "shall contain." Seizing on the words "[t]he action for sale of a burial ground *shall* be commenced" (emphasis added), the Coalition argued that BR § 5-505 imposes a mandatory obligation.[8] Additionally, the Coalition cited dicta from *Hickman ex rel. Hickman v. Carven*, 362 Md. 362, 371 (2001), in which the Court wrote, among other things, that through BR § 5-505(a), the General Assembly "has . . . provided for, and perhaps requires, a court judgment prior to the sale of a burial ground."

The Coalition went on to argue that it had adequately alleged that the property contained a burial ground. Among other things, the Coalition cited the statements in which HOC itself had acknowledged the existence of a burial ground on the Westwood Tower property.

---

[8] The Coalition has wisely abandoned that argument on appeal. Rule 14-401(b), read properly, does not require someone to commence an action for the sale of a burial ground. Rather, it dictates the manner by which such an action must be brought (i.e., by filing a complaint that complies with Rules 2-303 through 2-305 and that contains other, specific information).

Finally, the Coalition argued that all of the plaintiffs had standing because they were "persons in interest" who were entitled to notice of an action to sell a burial ground for another purpose under Rule 14-401(c).[9]

A week later, Charger moved to intervene as of right under Md. Rule 2-214(a), which states that, "[u]pon timely motion, a person shall be permitted to intervene in an action as . . . (2) when the person claims an interest relating to the property or transaction that is the subject of the action, and the person is so situated that the disposition of the action may as a practical matter impair or impede the ability to protect that interest unless it is adequately represented by existing parties." Just before the hearing on the motion for a preliminary injunction on September 27, 2021, the court denied Charger's motion to intervene. Consequently, Charger was unable to participate in the hearing to determine whether HOC should be enjoined from selling the property that Charger had contracted to purchase.[10]

_____

[9] Rule 14-401(c) states that, in an action to sell a burial ground for another purpose, the clerk of the circuit court must inform "all lot owners or other persons in interest of the latest date by which a response may be filed." Section 14-121(a)(4) of the Real Property Article of the Maryland Code (1974, 2015 Repl. Vol.) defines the "[p]erson[s] in interest" who have access to burial sites to include persons who are "related by blood or marriage to the person interred in a burial site" and persons who have "a cultural affiliation with the person interred in a burial site[.]"

[10] In denying Charger's motion to intervene, the court reasoned that Charger had "failed to demonstrate" that it had a "distinct interest" that was "not represented or advocated to any degree by HOC," or that "HOC and Charger have interests . . . that are adverse to one another." Yet, even when an intervenor's interests are aligned with those of an existing party, as Charger's were with HOC's, the two parties may not "necessarily have the same ultimate objective." *Stewart v. Tuli*, 82 Md. App. 726, 731 (1990). "[I]f the movant's interest is similar but not identical to that of the existing party, a

The court proceeded to hear argument on HOC's motion to dismiss and heard many hours of evidence on the Coalition's motion for a preliminary injunction. In addition to the evidence detailed above, the court heard from Lyle Torp, an archeologist whom the court accepted as an expert in the identification, evaluation, and study of historical cemeteries. Mr. Torp testified that there is "no doubt" that a cemetery is located on the Westwood Tower property. In Mr. Torp's expert opinion, it is "highly unlikely" that all of the bodies buried at the Moses Cemetery were removed as a result of the earth-moving activities on the site.

Similarly, the court heard that the chairman of HOC has acknowledged that the property contains an "African-American cemetery referred to as White [sic] Tabernacle No. 39, Moses Cemetery." The court also heard that a senior official in the Montgomery County Planning Department has stated the cemetery extends over two parcels, parcels 175 and 177, but that "[m]ost of the remains were probably buried on Parcel 175," which is "now a paved parking lot for Westwood Tower Apartments." Finally, the court heard

---

discriminating judgment is required on the circumstances of the particular case, but the movant ordinarily should be allowed to intervene unless it is clear that the party having a similar interest will provide adequate representation." *Id*. at 732. Moreover, "the burden of showing that existing representation may be inadequate is a minimal one." *Id*. In this case, Charger's objectives were quite different from HOC's, because Charger was purchasing the property in a "like-kind exchange" under § 1031 of the Internal Revenue Code, and thus its members faced the prospect of adverse tax consequences unless the purchase was completed within a strict and inflexible deadline. HOC, by contrast, had the option to look for other purchasers if Charger backed out of the deal when the deadline could not be met (as Charger ultimately did). It bears mention that, as the contract purchaser in a sale that the Coalition was trying to enjoin and subject to court approval, Charger was arguably a necessary party that *had* to be joined. *See* Md. Rule 2-211(a).

10

that, in its agreement with Charger, HOC had acknowledged that a cemetery "was located on or below a portion of" the property that it had agreed to convey.

On October 27, 2021, the court denied HOC's motion to dismiss. On the same day, the court granted the Coalition's motion for a preliminary injunction and enjoined HOC from proceeding with the sale until the court had decided whether to grant or deny a writ of mandamus.

In both decisions, the court rejected all of HOC's arguments, including its principal argument, that BR § 5-505 does not require court approval for the sale of the burial site under parcel 175. The court relied prominently on a legal encyclopedia for the proposition that: "[W]hen a tract of land has been dedicated as a cemetery, it is perpetually devoted to the burial of the dead and may not be appropriated to any other purpose, at least in the absence of any authorized exercise of the power of eminent domain." (Footnote omitted.) The court also relied on the dicta in *Hickman v. Carven*, 366 Md. at 371, to the effect that BR § 5-505 "perhaps requires [] a court judgment prior to the sale of a burial ground."

On November 4, 2021, HOC asked the court to enter a final order granting the writ of mandamus. HOC explained that, in ruling that BR § 5-505 requires HOC to seek court approval for the sale of the burial site, the court had effectively decided that the Coalition was entitled to a writ of mandamus.

While the parties had been awaiting a decision on the motion for a preliminary injunction, Charger renewed its request to intervene. On November 19, 2021, however, Charger withdrew that motion. Charger explained that the preliminary injunction had

11

"prevented it from timely acquiring the property at issue."  "[A]s a result," Charger said, it had "exercised its right to terminate the purchase and sale and agreement," and thus "no longer ha[d] any contractual rights relating to property."  No one, including the court itself, appears to have questioned whether the case had become moot now that there was no longer a sale to enjoin or subject to court approval.

On November 29, 2021, the court proceeded to enter a final order stating that HOC must comply with BR § 5-505 "prior to selling Westwood Tower Apartments and parcel 175."  HOC noted a timely appeal from that order.[11]

### QUESTIONS PRESENTED

HOC presents three questions, which we have reordered and rephrased in the interest of concision:

1.  Did the circuit court err in concluding that the Coalition and the individual appellees have standing?

2.  Did the circuit court err in concluding that, under BR § 5-505, HOC was required to seek court approval for the sale of parcel 175?

3.  Did the circuit court err or abuse its discretion in concluding that the Coalition was entitled to a writ of mandamus ordering HOC to comply with BR § 5-505 before selling parcel 175?[12]

---

[11] HOC had previously filed a timely interlocutory appeal from the order granting the preliminary injunction.  This Court combined both appeals into the same case.

[12] HOC phrased its questions as follows:

1.  Whether the Circuit Court erred in deciding a question of law when it failed to construe Md. Code Ann., Bus. Reg. § 5-505 consistent with its plain and unambiguous meaning, when it held that the statute must apply to a sale of property once used for burial purposes sixty years ago before being destroyed, paved over for residential parking use, and

Before we reach the merits, we must address questions that neither party raised. First, is the case moot because there is no longer a sale to enjoin or subject to court approval? Second, if the case is moot, are we nonetheless entitled to decide it under an exception to the general rule that courts should not decide moot cases? We conclude that the case is moot, but that we may decide it under the exception for cases that "'present[] a recurring matter of public concern which, unless decided, will continue to evade

subsequently sold three times for continued non-burial use without challenge; where the prospective sale would result in maintained non-burial use with no evidence of interference to subterranean land; and where it is unknown whether bodies remain interred underneath the property.

2. Whether the Circuit Court erred when it held that Appellees have standing—that is individual Appellees are "persons of interest", as defined by Md. Code Ann., Real Prop. § 14-121(a)(3)-(4), by claiming either a cultural affiliation with, or relatives by blood or marriage of persons interred under the portion of parcel 175 owned by the Housing Opportunities Commission of Montgomery County (hereinafter "HOC") by referencing documentation that makes no mention of the parcel; that Appellee, Bethesda African Cemetery Coalition ("BACC"), established an organizational property interest separate and distinct from that of its individual members; and that Appellees would suffer a special kind of damage as a result of HOC's sale.

3. Whether the Circuit Court erred in deciding a question of law establishing that Appellees are clearly entitled to the drastic and extraordinary remedy of a writ of mandamus to order a quasi-governmental affordable housing agency to comply with a discretionary statute, despite any alleged rights to participate in a Md. Code Ann., Bus. Reg § 5-505 action requiring predicate and discretionary actions by a complainant and the Court and Appellees have other recourse available.

13

review[.]'" *La Valle v. La Valle*, 432 Md. 343, 352 (2013) (quoting *Off. of the Pub. Def. v. State*, 413 Md. 411, 423 (2010)).

On the merits, we conclude that at least three of the individual plaintiffs have standing, but that BR § 5-505 does not require HOC to seek and obtain court approval for the sale of parcel 175. HOC can sell the property without obtaining court approval, but the property will remain subject to the claims of the lot holders.

In view of our interpretation of BR § 5-505, we need not consider HOC's third question, concerning the Coalition's entitlement to a writ of mandamus.

ANALYSIS

## I. Mootness

On November 21, 2021, after the court had denied its motion to intervene, Charger, the prospective purchaser, informed the court that it had "exercised its right to terminate the purchase and sale and agreement," and thus "no longer has any contractual rights relating to property." Because this is a case to enjoin a sale and to require the seller to obtain court approval for the sale, it would certainly seem that the case became moot once Charger had terminated the "purchase and sale and agreement."

None of the parties raised the issue of mootness (or even mentioned the buyer's termination of the agreement) in their briefs. Consequently, we ordered the submission of additional briefing on whether the case is moot and, if so, whether this Court should decide the merits under an exception to the general principle that courts should not decide moot cases. *See State v. Ficker*, 266 Md. 500, 506-07 (1972) (stating that "[a]ppellate courts do not sit to give opinions on abstract propositions or moot questions, and appeals

14

which present nothing else for decision are dismissed as a matter of course"); *accord Cottman v. State*, 395 Md. 729, 744 (2006).[13]

"Generally, a case is moot if no controversy exists between the parties or 'when the court can no longer fashion an effective remedy.'" *D.L. v. Shepherd Pratt Health Sys., Inc.*, 465 Md. 339, 351-52 (2019) (quoting *In re Kaela C.*, 394 Md. 432, 452 (2006)). Both parties deny that the case is moot.

HOC argues that the circuit court's decision limits the marketability of its property. Its argument fails to recognize that we would vacate that decision and order that the complaint be dismissed if we determined that the case is moot. *See, e.g.*, *Stevenson v. Lanham*, 127 Md. App. 597, 626-27 (1999).

The Coalition argues that the case is not moot because, it says, its mandamus action was "never specific to Charger."[14] It asserts that HOC intends to sell the property to someone. Thus, it argues that it is entitled to a writ of mandamus requiring HOC to obtain court approval for the sale of the property even if HOC does not currently have a prospective purchaser.

We disagree with the Coalition's contention that the case is not moot. There was a live controversy for the circuit court to decide only as long as HOC had a viable prospect of selling the property to a third party, like Charger. Once Charger withdrew from the

---

[13] We also asked the parties to address whether Charger was a necessary party and whether a hypothetical future purchaser would be a necessary party in a future action to require HOC to obtain court approval for the sale of the property.

[14] As to whether mandamus would be a proper remedy in this case, see n.7, above.

deal, there was no longer a sale for the court to enjoin; nor was there a sale to submit for court approval.

The Coalition argues that the case is not moot because a similar controversy might, or even will, occur again. We disagree. In the leading case of *Lloyd v. Board of Supervisors of Elections of Baltimore County*, 206 Md. 36, 43-44 (1954), the Court held that a mandamus-based challenge to certain ballot requirements became moot once the election had occurred, even though another election was virtually certain to occur only a few years hence. If the issue arose again, the Court explained, there would be "no difficulty in having it passed upon by this Court as a live issue." *Id*. at 44.

Yet, even if the case is moot, an appellate court may still proceed to decide the case if the following conditions are met:

1. the public interest clearly will be hurt if the question is not immediately decided,

2. the matter is likely to recur frequently,

3. its recurrence will involve a relationship between government and its citizens, or a duty of government, and

4. upon any recurrence, the same difficulty which prevented the appeal at hand from being heard in time is likely again to prevent a decision.

*Lloyd v. Bd. of Supervisors of Elections of Baltimore Cnty.*, 206 Md. at 43; *accord Reyes v. Prince George's County*, 281 Md. 279, 300 n.18 (1977).

The issue in this case undoubtedly will recur. HOC makes no secret of its intention to sell the property, if only to ensure that the buyer will make the necessary

16

capital improvements and that the millions of dollars in sale proceeds can be used to expand and preserve affordable housing in Montgomery County.

The issue is also likely to evade review. As HOC argues, "it is not reasonable to expect a prospective purchaser to be able and willing to hold its plans and earmark a significant amount of money for an indefinite time while this matter is decided." And as the Coalition argues, "one can imagine a continuous loop of these occurrences, where the case always becomes moot on appeal because prospective purchasers do not want to 'sit on their contracts' (at the mercy of market fluctuations) and wait for the mandamus action (and appeals) to play out."

Because HOC is a quasi-governmental entity, the recurrence of the issue will certainly "involve a relationship between government and its citizens, or a duty of government[.]" *Lloyd v. Bd. of Supervisors of Elections of Baltimore Cnty.*, 206 Md. at 43.

Finally, the public interest will, in our judgment, clearly be hurt if we refrain from deciding the issue. The Moses Cemetery has properly been a subject of enormous public concern for years. In 2016, a previous owner was forced to halt its plans to redevelop the property because of the public outcry about the potential existence of a cemetery on the property. The County Planning Department interjected itself into that controversy and, in conjunction with the owner, commissioned the archeological study that confirmed the existence of the cemetery. In the wake of the controversy about the Moses Cemetery, the Montgomery County Council has passed legislation that "requires the Planning Board to maintain an inventory of human burial sites in the county" and "requires these sites to be

preserved and protected during the preliminary plan of subdivision review and approval process."[15] According to the circuit court, Montgomery County has sponsored efforts to mediate a resolution of this dispute. The Coalition and the individual plaintiffs have pressing concerns about the ongoing desecration of this cemetery and the obliteration of African American history. And HOC has concerns of its own about its ability to discharge its obligation to provide, expand, and preserve affordable housing in a jurisdiction in which affordable housing is scarce.

For these reasons, we shall decide the merits of the case even though it is moot.

## II. Standing

In the circuit court, HOC contended that the Coalition and the individual plaintiffs lacked standing to bring this action. The circuit court disagreed, reasoning that they were "persons of interest" who would be entitled to notice of an action for court approval of the sale of a burial ground for another purpose. HOC challenges that ruling on appeal.

In rejecting HOC's argument on standing, the circuit court relied on Rule 14-401, the procedural rule that implements BR § 5-505. Rule 14-401(c) states that, upon the filing of a complaint for the sale of a burial ground for another purpose, the clerk must issue a notice (rather than a summons). The notice must, among other things, "inform all lot owners or other persons in interest of the latest date by which a response may be

---

[15] https://perma.cc/F9NZ-MT2F. Bill No. 24-17 amended § 33A-17 of the Montgomery County Code to require the Planning Board to maintain the inventory of burial sites. Ordinance No. 18-31 amended several provisions of Chapter 50 of the Montgomery County Code to insert protections for those burial sites during the process of obtaining approval for the development of land.

18

filed." The notice is not served on the "lot owners or other persons in interest," but must be published as provided in Rule 2-122, the rule regarding service by posting or publication in an in rem or quasi in rem proceeding.[16]

Rule 14-401(c) does not define the "persons in interest" who are entitled to notice. But in a statute on the related topic of access to burial sites, the General Assembly has defined the term "person in interest" as someone who:

(i) Is related by blood or marriage to the person interred in a burial site;

(ii) Is a domestic partner, as defined in § 1-101 of the Health-General Article, of a person interred in a burial site;

(iii) Has a cultural affiliation with the person interred in a burial site; or

(iv) Has an interest in a burial site that the Office of the State's Attorney for the county where the burial site is located recognizes is in the public interest after consultation with a local burial sites advisory board or, if such a board does not exist, the Maryland Historical Trust.

Maryland Code (1974, 2015 Repl. Vol.) § 14-121(a)(4) of the Real Property ("RP") Article.

Three of the individual plaintiffs—Ms. Hunter, Mr. Cuba, and Ms. Wallace—claim to be related by blood or marriage to persons who were buried in the Moses Cemetery. Therefore, they are undeniably "persons in interest" under RP § 14-121(a)(4).

HOC does not contend that the circuit court erred in using the definition of "person in interest" in RP § 14-121 to interpret the meaning of the term "persons in interest" in Rule 14-401(c). In other words, HOC does not dispute that if someone is a

---

[16] The notice must also be "posted in a conspicuous place on the property and at all principal gates or entrances to the burial ground." Md. Rule 14-401(c).

19

"person in interest" under RP § 14-121, they are also a "person in interest" under Rule 14-401(c). Instead, HOC argues that Ms. Hunter, Mr. Cuba, and Ms. Wallace have not provided certificates or deeds that show that their ancestors were buried in parcel 175 (as opposed to the neighboring parcel 177, which HOC does not own). Additionally, HOC seems to argue that Ms. Hunter, Mr. Cuba, and Ms. Wallace cannot prove that their ancestors are still interred on parcel 175, as the evidence showed that some of the human remains on the site were removed (illegally, it appears) during the construction of Westwood Tower or the paving of the parking lot.

HOC's arguments do not establish that Ms. Hunter, Mr. Cuba, or Ms. Wallace lack standing.

In arguing that Ms. Hunter, Mr. Cuba, and Ms. Wallace must produce certificates or deeds to establish their standing, HOC relies on *McDonough v. Roland Park Co.*, 189 Md. 659 (1948). *McDonough* is inapposite. It concerns the proof that is required to establish the existence and location of a cemetery (in that case, a private family cemetery on what once was farmland). *Id.* at 665-66. In this case, however, there is no question that there is a cemetery beneath parcel 175. The court found that there is a cemetery beneath the parcel; and HOC has not only failed to challenge that finding, but it has admitted elsewhere that there is a cemetery on the site. The failure to produce deeds or certificates has no bearing on whether Ms. Hunter, Mr. Cuba, and Ms. Wallace have

20

standing as persons related by blood or marriage to someone who was or may have been interred in parcel 175.[17]

Furthermore, the evidence was sufficient to establish that the ancestors of Ms. Hunter, Mr. Cuba, or Ms. Wallace are probably still interred in parcel 175. The evidence showed that most of the remains—200 bodies or more—were interred on parcel 175. The record contains nothing to suggest that all, most, or even many of those bodies were disinterred and removed. To the contrary, the record reflects, at most, a sporadic effort to remove human remains when they were uncovered during the construction of the apartment building or the adjacent parking lot. In these circumstances, it seems likely that one or more of those three plaintiffs have standing on the ground that they are related by blood or marriage to someone who was interred, and is still interred, in parcel 175. If any one of the three has standing, the requirement of standing is met. *Fraternal Order of Police Lodge 35 v. Montgomery County*, 436 Md. 1, 13 n.13 (2013).[18]

---

[17] The absence of deeds or certificates does bear on the issue of whether the burial ground in this case is a "burial ground" to which BR § 5-505 applies—i.e., one in which "burial lots have been sold . . . and deeds executed or certificates issued to buyers of the lots[.]" Here, the court had information suggesting that burial plots were sold, but no evidence that deeds were executed or that certificates were issued. The court addressed that deficiency by reasoning that the tax records reflected the 1958 sale of a "burial ground," which the court tacitly equated with the sale of a burial ground under BR § 5-505. But the sale of a generic "burial ground" is not necessarily the same as the sale of a burial ground for which "burial lots have been sold in the burial ground and deeds executed or certificates issued to buyers of the lots[.]" BR § 5-502(a)(2). We need not consider that issue, however, as HOC does not argue that the absence of deeds and certificates means that BR § 5-505 does not apply to the burial ground in this case.

[18] Because of our resolution of this issue, it is unnecessary to decide whether Reverend Adebayo and the Coalition also qualify as "persons in interest" who would be

**III. The Merits**

**A. Sold "for Another purpose"**

Our first substantive problem is that BR § 5-505(a) applies only to the sale of certain burial grounds "for another purpose."  HOC argues that it was not selling its property "for another purpose," because the property would be used for the same purposes for which it had been used for the last 50 years—an apartment building and a parking lot.  The Coalition responds that after the sale the property would be used for a purpose other than a graveyard and, thus, that HOC was selling the property "for another purpose."

"The goal of statutory construction 'is to ascertain and effectuate the actual intent of the General Assembly.'"  *In re Emergency Remedy by Maryland State Bd. of Elections*, 483 Md. 371, 404 (2023) (quoting *Thornton Mellon LLC v. Adrianne Dennis Exempt Trust*, 478 Md. 280, 313 (2022)).  "[T]o determine [the General Assembly's] purpose or policy, we look first to the language of the statute, giving it its natural and ordinary meaning."  *Id.* (quoting *Peterson v. State*, 467 Md. 713, 727 (2020)).  We afford "words their natural and ordinary meaning," *Davis v. State*, 426 Md. 211, 218 (2012), and "[w]e neither add nor delete language[.]"  *State v. Bey*, 452 Md. 255, 265 (2017).

entitled to notice of a complaint to sell the burial ground for another purpose. Nonetheless, as the pastor of the Macedonia Baptist Church, which is described as the "sole surviving institution from the River Road African American community," Reverend Adebayo could certainly claim to have "a cultural affiliation" with those interred in the burial ground.  Similarly, the Coalition, which was created by members of the Macedonia Baptist Church, who include the descendants of persons who had been enslaved on plantations in the River Road area of Bethesda, would also seem to have "a cultural affiliation" with those interred in the burial ground.

22

Unfortunately, the language of BR § 5-505(a) offers little assistance in resolving this dispute. The statute probably applied to the initial sale of the cemetery, which occurred in 1958, when the representatives of White's Tabernacle conveyed parcel 175 to Leo Furr. But did it apply only to the first sale "for another purpose"? Or did it also apply to every subsequent conveyance over the last six decades, including the aborted conveyance from HOC to Charger?

The statute is ambiguous because the statutory language can reasonably be interpreted to apply both to the first sale alone and also to every subsequent sale. *See 75-80 Props., L.L.C. v. Rale, Inc.*, 470 Md. 598, 624 (2020). On one hand, lot 175 has been used for the "purpose" of housing and parking since about 1969, so a sale for that same "purpose" would not seem to qualify as a sale "for another purpose." On the other hand, the property still contains a burial ground, so the property will be used "for another purpose" as long as it is not used (or perhaps not used solely) as a burial ground. "[A] cemetery, including human remains, still exists on the [p]roperty," albeit "in a desecrated state." *Rhee v. Highland Dev. Corp.*, 182 Md. App. 516, 543 (2008).

"'When a statute can be interpreted in more than one way, the job of this Court is to resolve that ambiguity in light of the legislative intent, using all of the resources and tools of statutory construction at our disposal.'" *75-80 Props., L.L.C. v. Rale, Inc.*, 470 Md. at 624 (quoting *Lillian C. Blentlinger, LLC. v. Cleanwater Linganore, Inc.*, 456 Md. 272, 295 (2017)). One of those tools is a review of the legislative history. *See, e.g.*, *Nationstar Mortg. LLC v. Kemp*, 476 Md. 149, 170 (2021). In this case, however, we have little meaningful legislative history.

23

The predecessor of BR § 5-505 was first enacted in 1868. Archives of Maryland, Vol. 142, Pages 2706-07.[19] That statute was repealed and replaced in 1888. Archives of Maryland, Vol. 481, Pages 617-19.[20] The 1888 statute was revised to require compliance with the Maryland Rules in 1962. Archives of Maryland, Vol. 651, Page 114.[21] The 1962 statute was recodified in its present form as part of the Business Regulation Article in 1992 (Archives of Maryland, Vol. 808, Page 164-65) and renumbered in 1997 (Archives of Maryland, Vol. 795, Pages 3876-77).

The phrase "for another purpose" first entered the statute in the 1992 recodification. The recodification is accompanied by a revisor's note, which states that this "new language" was "derived without substantive change from" the former statute. Archives of Maryland, Vol. 808, Page 165.[22] The revisor's note added that "the reference to the authority of a court to pass a judgment for sale of a burial ground for another purpose is added to state explicitly what only was implied in the former law," which had referred to a sale "for other purposes." Archives of Maryland, Vol. 651, Page 114 (1962 revision).

Thus, the legislative history informs us that the 1992 amendment did not change the law, but the amendment sheds no light on what the law meant. In particular, the

---

[19] For the full text of the 1868 statute, see n.32, below.

[20] For the full text of the 1888 statute, see n.35, below.

[21] The 1962 revision was codified in article 16, § 119, of the Maryland Code.

[22] A revisor's note is "an expression of legislative intent on which we may rely[.]" *Gateway Terry, LLC v. Prince George's County*, 253 Md. App. 457, 472 (2022).

24

legislative history sheds no light on whether a burial ground is being sold "for another purpose" when it lies beneath the parking lot of a 55-year-old apartment building on a property that has been sold several times "for another purpose," without court approval.

With no meaningful assistance from the legislative history, we look to the other tools of statutory construction. One of those tools is the canon that, "[i]n construing a statute, 'we avoid a construction of the statute that is unreasonable, illogical, or inconsistent with common sense.'" *75-80 Props., L.L.C. v. Rale, Inc.*, 470 Md. at 624 (quoting *Bellard v. State*, 452 Md. 467, 482 (2017)). HOC's interpretation could be said to lead to an illogical result.

If, as HOC argues, BR § 5-505 does not apply to a property containing a burial ground when the property has previously been sold "for another purpose" and is currently being used for purposes other than a burial ground, then an owner, like HOC, could not use BR § 5-505 to convey the property free of the lot holders' claims. Nor could a potential purchaser use § 5-505 to acquire the property free of those claims. In those circumstances, the property might remain forever burdened by the claims. Because we are skeptical that the General Assembly would have intended this result, we shall assume, for the sake of argument, that the contemplated sale from HOC to Charger was the sale of a burial ground "for another purpose."[23]

---

[23] If court approval were required for every sale of the property since 1958, including the most recent sale in 2018, one might ask whether principles of estoppel, laches, or waiver could bar the current claims. HOC, however, makes no such argument, and we do not consider it in this opinion.

## B.  The Meaning of "May"

On the merits, HOC's argument is quite simple.  BR § 5-505, it observes, says that an action "*may* be brought for sale of a burial ground for another purpose," not that such an action "*shall* be brought."  (Emphasis added.)  The use of "may," HOC argues, "is an unambiguous declaration that an action on the part of the owner is not mandatory but permissive" and that it is necessary to bring the action only "when the owner seeks to convey clear title."  Therefore, HOC concludes, the statute "does not *command* that an owner of land that was a former burial ground must bring an action."  (Emphasis in original.)

HOC is correct that "may" (as opposed to "must" or "shall") generally connotes permission or authorization.  *See, e.g.*, *Uthus v. Valley Mill Camp, Inc.*, 472 Md. 378, 393-94 (2021) (citing *WSC/2005 LLC v. Trio Ventures Assocs.*, 460 Md. 244, 271 (2018); *Brodsky v. Brodsky*, 319 Md. 92, 98 (1990); *Rowland v. Harrison*, 320 Md. 223, 232-33 (1990); *Maryland-Nat'l Cap. Park & Plan. Comm'n v. Silkor Dev. Corp.*, 246 Md. 516, 522-24 (1967)).  Maryland courts "have long interpreted the term 'may' in a statute to be permissive."  *Id.* at 393.  "By contrast," Maryland courts have "long held that the term 'shall' in a statute indicates the legislative intent that the statute be mandatory."  *Id.* at 394 (citing *75-80 Props., L.L.C. v. Rale*, 470 Md. at 631-32; *Perez v. State*, 420 Md. 57, 63 (2011); *State v. Green*, 367 Md. 61, 82 (2001); *Thanos v. State*, 332 Md. 511, 522 (1993); *In re James S.*, 286 Md. 702, 706 (1980); *Harvey v. State*, 51 Md. App. 113, 118-19 (1982)).

26

For example, in *Uthus v. Valley Mill Camp, Inc.*, 472 Md. at 393-97, the Court interpreted RP § 14-132(d), which states that, in an action involving the wrongful detainer of real property, the "person claiming possession *may* make complaint in writing to the District Court of the county in which the property is located." (Emphasis added.) In view of "[t]he permissive language of the wrongful detainer statute," the Court held "that a wrongful detainer action in District Court is an option to pursue when attempting to remove someone not legally on a property, but not the exclusive remedy." *Id.* at 396. Thus, the Court held that the entity claiming possession was not required to assert its rights through a wrongful detainer action in district court, but that it could instead pursue an action for trespass in the circuit court. *Id.*

The Coalition responds by citing *Office & Professional Employees International Union, Local 2 v. Mass Transit Administration*, 295 Md. 88, 96 (1982), in which the Court remarked that, "where a statute authorizes or permits a person or agency to take a certain type of action in a particular manner, such manner becomes a mandatory limitation, and the action must be taken in conformity with it." On the basis of this authority, the Coalition argues that, in some circumstances, "may" may connote "shall."

In the *Office & Professional Employees* case, the General Assembly had enacted legislation stating that the Mass Transit Administration ("MTA") "may" enter into collective bargaining agreements with "'the accredited representatives of the employees who form part of any operating company that the Administration acquires.'" *Id.* (quoting Maryland Code (1977), § 7-601 of the Transportation Article). A few years later, the MTA began to plan and develop a subway, which entailed the hiring of new clerical

27

employees. *See id.* at 92. In addition, the MTA became part of the new Department of Transportation, which resulted in the hiring of more, new clerical employees. *Id.*

It was undisputed that these new employees "were not employed by any operating company acquired by the MTA." *Id.* at 98. Nonetheless, the new employees demanded the right to become members of the bargaining unit with which the MTA was authorized to engage in collective bargaining. *Id.* at 92-93. In response, the MTA sought and obtained a declaratory judgment establishing that it had no obligation to enter into collective bargaining with these employees. *Id.* at 93-94.

On appeal, the Court affirmed. It based its decision, in part, on two principles of statutory construction: first, the principle that the expression of one thing implies the exclusion of all others (i.e., *expressio unius est exclusio alterius*); and second, the principle, cited by the Coalition, that "where a statute authorizes or permits a person or agency to take a certain type of action in a particular manner, such manner becomes a mandatory limitation, and the action must be taken in conformity with it." *Id.* at 96.

With these principles in mind, the Court reasoned that "the statutory permission for the MTA to enter into collective bargaining agreements 'with the accredited representatives of the employees who form part of any operating company that the Administration acquires' places a limitation upon the MTA's authority to enter collective bargaining agreements." *Id.* "The MTA," in other words, "may enter into such agreements only in accordance with § 7-601[,]" the statute that authorized the agency to engage in collective bargaining. *Id.* Because the new employees unambiguously fell

28

outside the ambit of § 7-601 (*id.* at 98; *id.* at 102-03), the MTA had no authority to engage in collective bargaining with them. *See id.* at 96.

The Coalition argues that, just as the MTA was statutorily empowered to enter into collective bargaining agreements as long as it acted in accordance with the terms of the statute, so too is the owner of a burial ground statutorily empowered to sell the ground for another purpose as long as it acts in accordance with BR § 5-505. In the Coalition's view, therefore, BR § 5-505 permits HOC to sell its property, but only if it seeks and obtains the court's approval under the statute.

The principal difficulty with the Coalition's argument is that it assumes what it needs to prove, which is that the owner of a burial ground has no right to sell the ground for another purpose except in accordance with BR § 5-505. Notably, in the *Office & Professional Employees* case, the Court recognized that, "absent express legislative authority, a government agency," like the MTA, "cannot enter into binding arbitration or binding collective bargaining agreements establishing wages, hours, pension rights, or working conditions for public employees." *Id.* at 97. But what is the basis for saying that, absent legislative authority, the owner of a burial ground is similarly incapable of selling the ground? Why is the grant of authority in BR § 5-505 any different from the grant of authority in RP § 14-132(d), which permitted, but did not require, a person claiming possession of real property to pursue a wrongful detainer action?

## C. The Common Law

The Coalition responds by asserting that, at common law, a burial ground was "perpetually dedicated as a resting place of the dead" and "could not be sold for another

purpose" unless a court ordered otherwise. In the Coalition's view, BR § 5-505 is a statutory "exception to the common law" by which the owner of a burial ground may obtain a court's permission to sell the burial ground for another purpose. The circuit court accepted the Coalition's conclusion.

The Coalition bases its assertions about the common law on a number of premises. We shall consider each of them in turn.

### 1. *Beatty v. Kurtz*

In arguing that the common law prohibited the sale of a burial ground for another purpose, the Coalition relies prominently on *Beatty v. Kurtz*, 27 U.S. (2 Pet.) 566 (1829). *Beatty* has nothing to do with the common law or about a common-law prohibition on the sale of burial grounds.

The pertinent facts of *Beatty* are as follows:

In 1769, Charles Beatty and a partner laid out an addition to the town of Georgetown (*id.* at 578), which was then in Maryland, but became part of the District of Columbia in 1790. "Upon the original plan so recorded, one lot was marked out and inscribed with these words, 'for the Lutheran church[.]'" *Id.* at 579.

Decades later, the putative trustees of the church, on behalf of themselves and the members of the church, filed suit in the court of equity in the District of Columbia. *Id.* They alleged that the members of the church had taken possession of the lot 50 years earlier, had built a church on the lot, and had used the land as a burial ground for the members of the church. *Id.* The first church had "decayed," but the trustees alleged that the members intended to build another church on the property "whenever their funds

30

would enable them so to do." *Id.* They also alleged that "the lot ha[d] been exempted from taxation as property set apart for a religious purpose." *Id.*

Charles Beatty, the grantor, had died 16 years earlier, without having conveyed the lot. *Id.* at 579-80. During his life, however, Beatty had "constantly avowed that the lot was appropriated for the Lutherans, and that they were entitled to it." *Id.* at 581. Furthermore, Beatty's heir, the defendant Charles A. Beatty, had, since his father's death, "repeatedly admitted the claim of the Lutherans to the lot, and his willingness that it should remain for them, as it had been originally appropriated." *Id.* at 582.

The trustees alleged that the second defendant, John T. Ritchie, had "unwarrantably disputed their title," that he had "entered upon the lot and removed some of the tomb stones erected thereon," and that he "mean[t] to dispossess [the members of the church] and to remove the tomb stones and graves." *Id.* at 580.[24]

By way of relief, the trustees asked that Beatty's heir be compelled to convey the lot to them. *Id.* They also asked "that they may be quieted in their possession, and that a writ of injunction may issue," apparently to bar the removal of the gravestones. *Id.* In other words, the trustees asked a court of equity to grant equitable relief: a decree of specific performance requiring that the lot be conveyed to them; an order quieting title to the property; and an injunction against the desecration of the graveyard.

---

[24] Although this information is not contained in the opinion itself, one author has written that Beatty's heirs and those of his co-grantor "entered the churchyard in the late 1820s and tore down fences and tombstones to prepare it for redevelopment." Tanya D. Marsh, *When Dirt and Death Collide*, 30 Prob. & Prop. 59, 61 (2016). The heirs did so on the premise that "the grant of land in the 1769 plat was a defeasible fee, the condition of which failed when the church fell down and was not replaced[.]" *Id.*

The court of equity "decreed a perpetual injunction against the defendants." *Id.*

On their appeal, the United States Supreme Court affirmed the grant of equitable relief.

In the opinion of the Court, Justice Joseph Story, the author of the nineteenth century treatise *Commentaries on Equity Jurisprudence*, wrote that the case presented two "principal questions":

> first, whether the title to the lot in question ever passed from Charles Beatty, so far at least as to amount to a perpetal [sic] appropriation of it to the use of the Lutheran church or to the pious uses to which it has been in fact appropriated. And secondly, if so, whether it is competent for the plaintiffs [the trustees] to maintain the present bill.

*Id.* at 582.

In response to the first question, the Court observed that, when Beatty first expressed an intention to convey a lot to the church, the church did not exist, and thus "there was no grantee capable of taking" the conveyance. *Id.* "Nor [could] any presumption of a grant arise from the subsequent lapse of time, since there never ha[d] been any such incorporated Lutheran church there capable of taking the donation." *Id.* "If, therefore, it were necessary that there should be a grantee legally capable of taking, in order to support the donation in this case; it would be utterly void at law, and the land might be resumed at pleasure"—by Beatty's heir. *Id.* at 582-83. In these circumstances, the Court recognized that, "[i]f the appropriation, therefore, is to be deemed valid at all, it must be upon other principles than those which ordinarily apply between grantor and grantee." *Id.* at 583.

The Court found those principles in the rules of equity pertaining to the dedication of property to "public and pious uses." *Id.* The Court cited former Article 34 of the

Maryland Declaration of Rights (1776), which, at the time, permitted the "sale, gift, lease or devise of any quantity of land, not exceeding two acres, for a church, meeting-house, or other house of worship, or parsonage, or for a burying-ground[.]"[25]  "To this extent," wrote the Court, former Article 34 "recognize[d] the doctrines of the statute of Elizabeth for charitable uses,"[26] under which leases for charitable uses "would be upheld, although there were no specific grantee or trustee." *Beatty v. Kurtz*, 27 U.S. at 583.  The Court reiterated that the grantor never withdrew the "appropriation" to the church (*id.* at 583-84); that the grantor's "plan and appropriation were constantly kept in view by all the legislative acts passed on the subject of this addition" to the town of Georgetown; that "[t]he plan was required to be recorded as an evidence of title"; and that the incorporation of the addition into Georgetown "had reference to" the plan. *Id.* at 584.

---

[25] In general, former Article 34 was intended to prohibit the conveyance of real property to members of the clergy or to religious institutions unless the conveyance was expressly sanctioned by the General Assembly. *Constitutional Convention Study Documents of the Constitutional Convention Commission of Maryland* 32 (State of Md. 1968).  The *Beatty* Court cited an exception that permitted small conveyances (at first, not exceeding two acres; later, not exceeding five acres) without legislative approval. Article 34 was renumbered as Article 35 in 1851 and as Article 38 in 1864. *Constitutional Convention Study Documents of the Constitutional Convention Commission of Maryland*, *supra*, at 32; Dan Friedman, *The History, Development, and Interpretation of the Maryland Declaration of Rights*, 71 Temple L. Rev. 637, 669 (1998).  It became a virtual dead letter in 1948, when the voters approved an amendment to remove the requirement of legislative approval for conveyances to the clergy or to religious institutions. *Constitutional Convention Study Documents of the Constitutional Convention Commission of Maryland*, *supra*, at 32.  It was repealed in 1977.  Dan Friedman, *The History, Development, and Interpretation of the Maryland Declaration of Rights*, *supra*, 71 Temple L. Rev. at 705 n.509.

[26] The Court was referring to the Charitable Uses Act of 1601 (43 Eliz. I, c.4).

From these premises, the Court concluded that the "appropriation" to the church "might at all times have been enforced as a charitable and pious use, through the intervention of the government as parens patriae, by its attorney general or other law officer." *Id.* The Court added: "It was originally consecrated for a religious purpose; it has become a depository of the dead; and it cannot now be resumed by the heirs of Charles Beatty." *Id.* Thus, the Court implicitly answered its first question in the affirmative: title to the lot had passed from Charles Beatty to the Lutheran church.

The Court turned to the second question: "the competency" of the putative trustees "to maintain the present suit." *Id.* The Court began by stating that if the trustees "were proved to be the regularly appointed committee of a voluntary society of Lutherans, in actual possession of the premises, and acting by their direction to prevent a disturbance of that possession, under circumstances like those stated in the bill," there would be no "serious objection to their right to maintain the suit." *Id.* The Court proceeded to explain, at some length, why the suit belonged in equity rather than at law:

> It is a case, where no action at law, even if one could be brought by the voluntary society, (which it would be difficult to maintain,) would afford an adequate and complete remedy. This is not the case of a mere private trespass; but a public nuisance, going to the irreparable injury of the Georgetown congregation of Lutherans. The property consecrated to their use by a perpetual servitude or easement, is to be taken from them; the sepulchres of the dead are to be violated; the feelings of religion, and the sentiment of natural affection of the kindred and friends of the deceased are to be wounded; and the memorials erected by piety or love, to the memory of the good, are to be removed so as to leave no trace of the last home of their ancestry to those who may visit the spot in future generations. It cannot be that such acts are to be redressed by the ordinary process of law. The remedy must be sought, if at all, in the protecting power of a court of chancery; operating by its injunction to preserve the repose of the ashes of the dead, and the religious sensibilities of the living.

*Id.* at 584-85.

In the Court's view, "[t]he only difficulty" was whether the trustees had "shown in themselves a sufficient authority" to pursue the suit, since their authority was "not evidenced by any formal vote or writing." *Id.* at 585. Although the Court was "incline[d] to think" that the trustees' authority "might be fairly presumed," it found it unnecessary "to decide the case on this point[.]" *Id.* Instead, the Court reasoned that this was "one of those cases, in which certain persons, belonging to a voluntary society, and having a common interest, may sue in behalf of themselves and others having the like interest, as part of the same society; for purposes common to all, and beneficial to all." *Id.*

In summary, *Beatty v. Kurtz* was an action in equity to compel the conveyance of a lot that had been dedicated for a charitable purpose (a church, to which a graveyard was later attached), to quiet title to the lot, and to enjoin others from trespassing onto the lot. *Beatty v. Kurtz* holds: (1) that the grant to the church was enforceable in equity and (2) that the trustees of the church could sue in equity to enforce those rights.

*Beatty v. Kurtz* does not hold, or even say, suggest, or imply, that at common law the owner of a burial ground was prohibited from selling the burial ground for another purpose. *Beatty v. Kurtz* has nothing to do with the common law, or with the sale of a burial ground. It was not an action at common law. It did not concern the sale of a burial ground. And it affords no support for the Coalition's argument (and the circuit court's

35

conclusion) that BR § 5-505 is a statutory exception to an alleged common-law

prohibition against the sale of burial grounds for another purpose.[27]

In fact, because "the Church of England had the legal authority to create rules and

adjudicate disputes regarding human remains" in England, "[t]he law of burial places in

England at the time of the American Revolution was therefore largely contained in

ecclesiastical law."[28]  Tanya D. Marsh, *When Dirt and Death Collide*, 30 Prob. & Prop.

59, 60 (2016).  The United States Constitution rejects "the establishment of a single

church," so "the United States was born with a sizeable legal void—it had *no law*

---

[27] Maryland's highest court followed *Beatty* in *Boyce v. Kalbaugh*, 47 Md. 334 (1877), a case that the Coalition cited in its supplemental brief.  In *Boyce* the parties asserted conflicting claims to a plot of ground.  One, a religious society, had used part of the plot as a burial ground "for upwards of twenty years."  *Id.* at 336.  This "notorious" use, the Court wrote, "affords presumptive evidence of its dedication as such."  *Id.*  The Court added that "the total inadequacy of any proceeding at law to give full redress for its disturbance, furnishes sufficient ground for the intervention of a Court of equity."  *Id.*; *accord Radomer Russ-Pol Unterstitzung Verein of Baltimore City v. Posner*, 176 Md. 332, 334 (1939) (stating that "[e]quity only affords an adequate remedy in cases involving the disposition of the bodies of the dead").  Following *Beatty*, whose "material facts" it found to be "analogous" (*Boyce v. Kalbaugh*, 47 Md. at 336), the Court held that the persons with a conflicting claim to the plot "cannot in good conscience and according to the principles of enlightened humanity, be permitted to defend themselves by the assertion of a stale legal claim; but they must be held to be effectually estopped from doing so."  *Id.* at 337.  Accordingly, the Court affirmed an injunction that prohibited the conflicting claimants from erecting structures on the plot.  *Id.*  Notably, *Boyce v. Kilbaugh*, like *Beatty*, is an action in equity, not at common law.  Moreover, *Boyce v. Kilbaugh*, like *Beatty*, does not involve the sale of a burial ground, much less some common-law prohibition on such a sale.

[28] This is not to say that the common law was entirely silent on the issue of burial grounds and the proper treatment of the dead.  At common law, it was a criminal offense "to treat the dead body indecently, and it was indictable wantonly or illegally to disturb a dead human after burial."  Rollin M. Perkins and Ronald N. Boyce, *Criminal Law* 476 (3d ed. 1982) (footnotes omitted).

regarding the disposition of human remains or burial places." *Id.* (emphasis added).

Because Congress and the state legislatures did not address the issue, "disputes in the 18th and 19th centuries were litigated, primarily in courts of equity[.]" *Id. Beatty v. Kurtz* is a prominent example of a court of equity grappling with novel issues pertaining to a property that had been used as a church and a graveyard, but had never been formally conveyed. It is not a case about a common-law prohibition on selling burial grounds for another purpose.[29]

## 2. Chapter 308 of the Laws of 1832

The Coalition claims to find other evidence of that common-law prohibition in Chapter 308 of the Laws of 1832.[30] According to the Coalition, the statute "forbade the

---

[29] In *Brendle v. German Reformed Congregation of Jackson Township*, 33 Pa. 415, 423 (1859), a court of *equity* enjoined the congregation from mortgaging its graveyard (not selling it), but declined to enjoin the congregation from mortgaging the rest of its property. The Pennsylvania Supreme Court affirmed the decision not to enjoin the congregation from mortgaging the rest of its property. The congregation did not appeal from the order enjoining it from mortgaging the graveyard, so the Supreme Court did not consider the validity of that ruling. *Id.* The Supreme Court's opinion, however, suggests that, under a statute from the colonial era, the congregation had broad powers to dispose of all of its property, including the graveyard:

> For what purposes could this congregation legitimately hold this land? The Act of 1731 says, for places of worship, burying-grounds, schools, and almshouses. Having, therefore, bought the land, they may hold and use it for these purposes, and they alone are to judge in what proportions they will apply it to each purpose. *And the land being entirely their own, they may sell it when and to whom they please.* No restraints on its use or alienation, imposed by themselves or others, are of any validity[.]

*Id.* at 425 (emphasis added).

[30] In full, the statute provides as follows:

Archbishop of Baltimore and others from selling burial grounds." Yet, if the common law already prohibited the Archbishop from selling burial grounds, as the Coalition says it did, it is difficult to understand why it was necessary to enact a statute to prohibit him from doing so.

---

Section 1. Be it enacted by the General Assembly of Maryland, That it shall and may be lawful to, and for the trustees of any Roman Catholic Church, in whom the title to any lot or lots of ground, whereon any Roman Catholic Church is now erected, or which is used as a grave-yard attached to any such church, to convey the same by deed to be executed, acknowledged and recorded in the visual manner, to the Most Reverend James Whitfield, the present Arch Bishop of Baltimore, and his successors in the Archiepiscopal see of Baltimore, according to the discipline and government of the Roman Catholic Church, forever, and it shall and may be lawful to, and for any person or persons or body corporate, to convey unto the Roman Catholic Arch Bishop of Baltimore, for the time being, and his successors as aforesaid, forever, by deed as aforesaid, any lot, piece or parcel of ground as aforesaid, for the purpose of having a Church erected thereon, for worship according to the discipline and government of the Roman Catholic Church, or for a grave-yard as aforesaid, which said lots of ground and premises, when so conveyed, are to be held by the said Roman Catholic Arch Bishop of Baltimore, and his successors as aforesaid, for the uses of the members of the Roman Catholic Church, worshipping at the respective places where such Churches may be, according to the government and discipline of the Roman Catholic Church; Provided always, that the property and estate, so to be conveyed and held, shall not, for any one congregation, exceed two acres; and provided, that such property be improved, enjoyed and used, only for a Church lot, parsonage and burial ground, or such conveyance, for such lot, shall be void; and provided, that nothing herein contained shall be so construed as to authorise the said Arch Bishop of Baltimore or his successors, to exact from the members of any congregation, who may make conveyances under this act, any contributions as a consideration for the use of said church property so conveyed, without their consent.

Archives of Maryland, Vol. 547, Page 376.

In any event, the 1832 statute did not, by its terms, forbid the Archbishop or anyone else from selling burial grounds. Rather, the statute permitted the trustees of a Roman Catholic church to convey a church or a graveyard to the Archbishop and his successors. The statute also permitted any person or "body corporate" to convey property to the Archbishop, provided that the property was "improved, enjoyed and used, only for a Church lot, parsonage and burial ground," and provided that the property so conveyed did not, "for any one congregation, exceed two acres." In addition, the statute provided that the conveyance would be "void" unless the property was "improved, enjoyed and used, only for a Church lot, parsonage and burial ground." This statute is not evidence of a common-law prohibition against the sale of burial grounds for other purposes.[31]

---

[31] The 1832 statute was enacted against the backdrop of former Article 34 of the Maryland Declaration of Rights (1776), which generally prohibited the conveyance of more than two acres of real property to members of the clergy or to religious institutions unless the conveyance was expressly sanctioned by the General Assembly. *See supra* n.25. A nineteenth century decision asserts that the 1832 statute "empowered" the Archbishop "to hold property in a corporate capacity." *Gump v. Sibley*, 79 Md. 165, 171 (1894). When the General Assembly enacted the predecessor of BR § 5-505 in 1868, and first authorized courts to approve the sale of certain kinds of burial grounds free and clear of certain claims, the legislature "enlarged the corporate powers granted to the archbishop by the act of 1832." *Gump v. Sibley*, 79 Md. at 171. Specifically, the legislature, by that act, "removed" the statutory "restriction" that required the Archbishop to use a lot "only as burial ground" and "enabled" the Archbishop "to cause the title to be conveyed to a purchaser." *Id.* at 171-72.

### 3.  The 1868 Statute and *Partridge v. First Independent Church*

In 1868 the General Assembly passed Chapter 211 of the Laws of 1868, the first

statutory predecessor of BR § 5-505.[32]  Maryland's highest court, then called the Court of

Appeals, first construed the statute in 1874, six years after it took effect.  *Partridge v.*

*First Independent Church*, 39 Md. 631 (1874).  The Court's opinion is inconsistent with

---

[32] The 1868 statute provided as follows:

Upon any bill being filed for the sale of any ground dedicated and used for
the purposes of burial in which lots have been sold and deeds executed or
certificates issued to the purchasers of such lots, provided such lots shall be
no longer used for burial purposes, the court may order notice to be given
by publication in one or more newspapers published in the city or county in
which the ground to be sold may be situated, stating the substance and
object of the said bill, and containing the names of the original lotholders or
their assignees if known, warning all the lotholders, whether they be
residents or non-residents, adults or infants to appear on or before a day
fixed in such order and show cause why the relief prayed should not be
granted, and such notice shall be published as the court may direct, not less
however than once a week for four successive weeks, two months before
the day fixed by such order for the appearance of the parties, and if such
lotholders shall not appear at the time stated in such notice a commission to
take testimony may be issued by the complainant *ex parte*.  That after the
return of such commission the court, upon being satisfied from the
testimony, that it is necessary and would be for the interest and advantage
of the parties interested that the ground should be sold, may forthwith pass
a decree for the sale of the same upon such terms as it shall deem proper,
and shall distribute the proceeds of sale among the parties interested
according to their several interests as the same shall be shown to the court.
That a decree passed in a proceeding for the sale of a burial ground shall be
valid to pass the title to the purchaser or purchasers of the same or any part
thereof free, clear and discharged of and from the claims of the corporation
or trustees who may hold the same for the purposes aforesaid, their
successors or assigns and of all persons an interest as lotholders in such
ground whether they are entitled as original lot-holders and whether they be
residents or non-residents, adults or infants.

Archives of Maryland, Vol. 142, Pages 2706-07.

the Coalition's contention that the statute created an exception to a common-law

prohibition against the sale of burial grounds for another purpose.

In *Partridge*, the church had sold a burial ground for another purpose, in

accordance with the 1868 statute. The Court was asked to decide two questions: (1) "the

nature and extent of the interest of the lot-holders"; and (2) "whether, and to what extent

they are entitled to distribution of the proceeds of the sale for and in respect to

improvements placed on the lots." *Id*. at 636.

Each lot holder had purchased a certificate from the church. *Id*. The certificate

established that the lot holder was the proprietor of a designated lot and that the church

had granted and conveyed the lot to the lot holder and his heirs and assigns, forever,

subject to the regulations of the church's trustees. *Id*. The certificates were not under

seal. *Id*.

The Court held, first, that the certificate "conferred no title or estate in the soil; nor

could it operate as a grant of an easement, because it was not under seal[.]" *Id*. at 637.

"At most," the Court wrote, the certificate "conferred only a privilege or license to make

interments in the lot described exclusively of others, as long as the ground remained a

burying ground or cemetery." *Id*. The Court held: "Whenever, therefore, by lawful

authority, the ground ceased to be a place of burial, the lot-holder's right and privilege

ceased, except for the purpose of removing the remains previously buried." *Id*. Quoting

a Pennsylvania case concerning a statute that authorized the closure of a cemetery, the

Court added: "'[I]f in the course of time it should become necessary to vacate the ground

as a burying ground, all that he could claim, in law or equity, would be that he should

41

have due notice and the opportunity afforded to him of removing the bodies and monuments to some other place of his own selection, or that, on his failing to do so, such removal should be made by others.'" *Id*. at 637-38 (quoting *Kincaid's Appeal*, 66 Pa. 411, 421 (1870)).[33]

Turning to the second question, the Court asked, "whether the lot-holder [was] entitled to compensation or reimbursement, out of the proceeds of sale of the burying ground, for improvements or erections placed on his lot[.]" *Id*. at 638. Partridge, who owned the lot, had spent a considerable sum of money on a burial vault. *Id*. The church had given Partridge the right to remove the vault. *Id*. Partridge, however, evidently declined to do so. *Id*. Instead, he insisted that he be paid out of the proceeds of the sale for the cost of constructing a new vault elsewhere. *Id*.

The Court rejected Partridge's claim. *Id*. at 638-39. According to the Court, "[t]he most that the lot-holders could claim to receive is the price paid by them for the license." *Id*. at 639. They had no interest in the land, and thus no interest in the proceeds of the sale of the land. *Id*. And although the 1868 statute directed that the proceeds be distributed "among the parties interested according to their several interests, as the same

---

[33] *Partridge* cited two similar cases that had also been cited in *Kincaid's Appeal*: *Richards v. North West Protestant Dutch Church*, 32 Barb. 42, 20 How. Pr. 317 (N.Y. Sup. Ct. 1859); and *Windt v. German Reformed Church*, 4 Sand. Ch. 471, 7 N.Y. Ch. Ann. 1175 (N.Y. Ch. 1846). Another case to similar effect is *Price v. Methodist Episcopal Church*, 4 Ohio 515, 539-41 (1831). By contrast, "[t]here are cases holding that where a private graveyard [e.g., a family graveyard] is established and clearly marked out, and markers maintained, an implied reservation or easement is created." *Hill Sand & Gravel Co. v. Pallottine Fathers House of Studies, Inc.*, 220 Md. 526, 531 (1959) (citing *Heligman v. Chambers*, 338 P.2d 144 (Okla. 1959); *Hines v. State*, 149 S.W. 1058 (Tenn. 1911)).

shall be shown to the Court," the Court interpreted that language to mean that "such interest in the land sold as would be represented by a fair and just proportion of the proceeds of the sale." *Partridge v. First Indep. Church*, 39 Md. at 639. Apparently because Partridge had no interest in the land, the statute gave him no right to the sale proceeds.

At this point, the *Partridge* Court mused that, "[i]f this cemetery had been sold simply from motives of gain or convenience to the church corporation, and against the consent of the lot-holders, then, perhaps, the right to compensation for all reasonable outlay for improvement and adornment of the burial lots could have been asserted[.]" *Id*. In *Partridge*, however, a court had authorized the sale under the 1868 statute, which required a finding that "*it was necessary*, and would be for the interest and advantage of the parties interested, that the ground should be sold." *Id*. (emphasis in original). In other words, the sale "was not, therefore, a mere matter of gain or caprice on the part of the church corporation that the ground be sold." *Id*.

The Court's closing comments strongly imply its belief that a burial ground *could* be sold for another purpose without obtaining court approval under the statute. For example, the Court suggested that if the ground were sold without court approval, the lot holders might have stronger claims than they would have if the ground were sold with court approval. Moreover, the Court envisioned that a burial ground could be sold for purposes of "gain," "convenience," or "caprice," which would not satisfy the statute. Thus, a mere six years after the enactment of the first statutory predecessor of BR § 5-

43

505, the court recognized that a burial ground could be sold for another purpose without following the statutory procedure.

### 4. *Reed v. Stouffer*

The Coalition finds support in *Reed v. Stouffer*, 56 Md. 236 (1881), in which the Court held that the proof was insufficient to show that the sale of the burial ground was "necessary" within the meaning of the 1868 statute. *See id.* at 253; *see also id.* at 252 (noting that neither of the two witnesses "testified that it was *necessary* to have [the ground] sold") (emphasis in original). The Coalition argues that "[t]he Court's denial of a sale under § 5-505's predecessor statute evidences that § 5-505 is mandatory."

The Coalition has misread *Reed v. Stouffer* as well as the 1868 statute that it applied. The 1868 statute expressly required a court to find that "it [was] *necessary* and would be for the interest and advantage of the parties interested that the ground should be sold" before the court could approve the sale. *See supra* n.32. Thus, under the 1868 statute, a court could approve the sale of certain burial grounds for another purpose only if, among other things, the proof "was sufficient to satisfy the court that such sale is *necessary*[.]" *Reed v. Stouffer*, 56 Md. at 252 (emphasis in original). Yet, neither the case nor the 1868 statute say that it was necessary (or, to use the Coalition's term, "mandatory") to invoke the statutory procedure; instead, the case and the statute say that the benefits of the 1868 statute (a decree passing title free and clear of the claims of the lot holders and others) are unavailable in the absence of proof that the sale was necessary.

In any event, in 1888, the General Assembly amended the statute to relax the requirement of proof that the sale was strictly "necessary." To approve a sale under the

44

1888 statute, a court was required to find only that "it [was] *expedient* or would be to the interest and advantage of the parties concerned that the said burial ground should be sold."  (Emphasis added).  Thus, under the 1888 statute, the proponent of the sale no longer had to prove that the sale was "necessary."[34]

In fact, because the 1888 statute (unlike the 1868 statute) is phrased in the disjunctive (using "or" rather than "and"), the proponent did not even have to prove that the sale was "expedient," but only that it would be "to the interest and advantage of the parties concerned" that the ground be sold.  The current statute continues to employ that relaxed standard.  *See* BR § 5-505(b) (requiring a court to find only that "it is expedient or would be in the interest of the parties to sell the burial ground").

In short, in arguing that *Reed v. Stouffer* means that section 5-505 is "mandatory," the Coalition misinterprets language that has not been part of the statute for more than 130 years.

## 5. *Rayner v. Nugent*

The clearest refutation of the Coalition's position (that the common law prohibited the sale of cemeteries) is a case that neither party cited: *Rayner v. Nugent*, 60 Md. 515 (1883).  In that case, a church had "determined to abandon the use of the ground as a cemetery and to dispose of it" in 1867 (*id.* at 518), the year before the General Assembly passed the first statutory predecessor of BR § 5-505.  John Nugent purchased the property from the church.  *Rayner v. Nugent*, 60 Md. at 518.

---

[34] For the full text of the 1888 statute, see n.35, below.

Before the conveyance to Nugent, the bodies buried in the cemetery were disinterred and reinterred elsewhere. *Id.* In addition, some of the lot holders received refunds of the consideration that they had paid for their "certificates" (i.e., the documents that entitled them to inter their dead in the cemetery). *Id.* No one seems to have objected to the removal of the bodies. *Id.* Nor does anyone seem to have claimed the right to burial in the cemetery at or after the time of the conveyance. *Id.*

After Nugent's death, his administrators agreed to sell the property to Rayner. *Id.* at 516. Rayner, however, tried to back out of the deal, objecting to the ratification of the sale in the orphans' court. *Id.* The orphans' court ratified the sale. *Id.* at 517.

On appeal, the Court framed the issue as follows: "The title in fee which the church received having been conveyed by deed to Nugent, it is only left to inquire whether there is anything in the character of the certificate issued to the lot-holders that can defeat or qualify the estate thus acquired by Nugent." *Id.* at 518.

The Court reasoned that, through their certificates, the lot holders acquired, at most, "a privilege or license to make interments in the lot described, exclusive of others, so long as the ground remains a burying place or cemetery." *Id.* at 519. Citing *Partridge*, the first case concerning the 1868 statute, the Court wrote: "Whenever, therefore, by lawful authority the ground ceases to be a place of burial, the lot-holders' rights and privileges cease, except for the purpose of removing the remains previously buried." *Id.* Thus, when the church "decided that the ground was no longer desirable as a place of interment," as it was empowered to do, "that decision operated to revoke the certificate or license, and the right of further interment was extinguished." *Id.* At that

46

point, "[t]he only right remaining was that of removing the bodies of those buried in the cemetery." *Id.* As that had already been done, the lot holders no longer had "any interest in the premises." *Id.*

The Court dismissed Rayner's concern that the unreimbursed lot holders might assert some right against him: "[W]e can perceive no ground upon which they could have any cause of action against the appellant for exercising any rights of possession enuring to him as the successor to Nugent's fee simple title." *Id.* at 520. The Court also dismissed Rayner's concern that "the sale to Nugent was a private one, and not made under a bill filed according to the provisions of the Act of 1868, ch. 211" (*id.*)—i.e., the first statutory predecessor of BR § 5-505. The Court explained:

> That Act of Assembly has furnished *additional facilities* for parties interested in abandoned burial grounds to procure a sale of the same; but it in no wise conflicts with the established doctrine relating to rights of burial in the cemeteries of religious bodies derived from certificates similar to that in the present case and their liability to extinguishment, upon which this appeal has been determined.

*Rayner v. Nugent*, 60 Md. at 520 (emphasis added).

*Rayner* clearly demonstrates that, even before the enactment of the 1868 statute, the owner of a burial ground (in that case, the church) had the ability to sell the burial ground for another purpose. If the common law prohibited a person from selling a burial ground for another purpose, as the Coalition asserts, then Nugent could never have acquired the former burial ground from the church and could not (through his administrators) have conveyed that property to Rayner. As the *Rayner* Court recognized, the 1868 statute simply "furnished additional facilities" for the sale of a burial ground.

47

*Id.* at 520. Under those "additional facilities," the parties concerned could gain the

security of a court judgment that extinguished the claims of the owner and the lot holders.

### 6. The 1888 Statute

In 1888, the General Assembly repealed the 1868 statute and replaced it with a

new statute, Chapter 369 of the Laws of 1888.[35] The Coalition finds significance in the

---

[35] The 1888 statute provided as follows:

In any case in which a burial ground has ceased to be used for burial purposes, and the said ground has been dedicated and used for burial purposes, and lots have been sold therein, and deeds executed or certificates issued to purchasers thereof, and it shall be considered desirable to dispose of said burial ground for other purposes, upon a bill being filed in any of the circuit courts of the State, in equity, in the city or county in which said burial ground is situated, setting forth the aforegoing facts, and containing the names of the lot owners or their assignees so far as known, the court shall order notice by publication in one or more newspapers published in the county or city where such burial ground is situated, warning all the lotholders or other persons in interest, residents or non-residents, adults or infants to appear in court on or before the day fixed in said notice, to show cause why the relief prayed for should not be granted; and said notice shall be such as the court may direct, not less, however, than once a week for four successive weeks two months before the day fixed by such order for the appearance of the parties; and upon a failure of appearance by any of said lot owners, or any party in interest by the time limited in said notice, the court may order testimony to be taken *ex parte*, according to the usual course in equity in cases of default for non-appearance; and upon testimony taken in the cause *ex parte*, or otherwise, if it is made to appear to the satisfaction of the court that it is expedient or would be to the interest and advantage of the parties concerned that the said burial ground should be sold, the court may forthwith pass a decree for the sale of said ground upon such terms and notice as it shall deem proper, and shall distribute the proceeds of sale among the parties interested according to their several interests, as the same shall be shown to the court; and before making said distribution the court may order and direct that so much and such part of said proceeds of sale, as shall be necessary for the purpose, shall be set aside and applied to the removal and burial of any dead that may lie in said

---

1888 statute because the current statutory language was "derived without substantive change from" the 1888 statute as revised to refer to the Maryland Rules in 1962. Archives of Maryland, Vol. 808, Page 165.

The Coalition focuses on the lengthy first clause of the 1888 statute, which begins, "In any case in which a burial ground has ceased to be used for burial purposes[.]"  On the basis of that clause, the Coalition argues that the 1888 statute "further clarified that the provisions outlined in the statutes must be adhered to whenever one desires to sell a burial ground for another purpose."  Read in full, the statutory language does nothing of the sort.

Despite the late-Victorian verbosity of the 1888 statute, the literal terms of the opening clause clearly establish that the entity that is required to act is "the court."  The statute required "the court" to "order notice by publication" if a bill were filed in equity in the circuit court in the city or county in which a burial ground was situated, setting forth facts establishing that the "burial ground has ceased to be used for burial purposes"; that "the ground ha[d] been dedicated and used for burial purposes"; that "lots ha[d] been

_____

> burial ground, in the purchase of a lot in any cemetery, graveyard, or other appropriate place of sepulture, and in the expense of disinterment and re-interment of said dead; and any decree passed in a proceeding for a sale of a burial ground, as hereinbefore provided for shall be valid to pass to the purchaser or purchasers of said burial ground the title of the same free, clear and discharged of, and from the claims of the corporation or trustees who may hold the same, their successors or assigns, and of all persons in interest as lotholders in such ground, whether they are entitled as original lotholders, and whether they be residents or non-residents, adults or infants.

Archives of Maryland, Vol. 481, Page 617-19.

sold therein, and deeds executed or certificates issued to purchasers thereof"; and that it was "considered desirable to dispose of said burial ground for other purposes[.]"

The 1888 statute dictated the terms of a bill if a bill were filed—it must "contain[] the names of the lot owners or their assignees so far as known." The statute did not, however, require the seller, the buyer, or anyone else to invoke the procedures of the statute. Instead, the sole consequence of failing to follow that statute was that the buyer would not acquire the property "free, clear and discharged of, and from the claims" of the lot holders and the owner of the burial ground.

### 7. *Diffendall v. Diffendall*

One of the few cases mentioning BR § 5-505 or its predecessors is *Diffendall v. Diffendall*, 239 Md. 32 (1965). In *Diffendall*, the Coalition asserts, Maryland's highest court "again recognized the mandatory nature of the statute." We see nothing in the *Diffendall* opinion to support that assertion.

*Diffendall* concerned a putative conflict between a statute and a constitutional provision. The statute (Md. Code (1957), art. 23, § 164) stated that a burial lot or crypt "shall not in any manner be subject to attachment or execution for debt or affected by the insolvent laws of this State." The constitutional provision (Article III, § 44) implicitly permitted the General Assembly to exempt only $500 of the "property of the debtor" from execution.

In *Diffendall*, a judgment-creditor claimed that the debtor's family burial crypts were worth more than $500 and that the statute was unconstitutional because it purported to prohibit him from executing upon the crypts. *Diffendall v. Diffendall*, 239 Md. at 36.

50

The Court rejected the creditor's constitutional contention by reasoning the debtor's "estate or interest" in the crypts "was not 'property of a debtor' within the purview" of the constitutional provision. *Id.* at 38.

In reaching its decision, the Court began by acknowledging the expansive scope of the word "property." "There can be little doubt," the Court wrote, "that the word 'property,' when considered in a broad sense, is a term of wide and rather comprehensive signification." *Id.* at 36. The Court added that "property" "embraces everything which has exchangeable value or goes to make up a man's wealth—every interest or estate which the law regards of sufficient value for judicial recognition." *Id.*

The Court recognized, however, that grave sites and crypts are an "unusual" kind of property. *Id.* at 37. "[T]hrough the ages," the Court wrote, "all civilized peoples have considered the final resting place of their dead as hallowed and sacred ground." *Id.* at 36. "Hence," the Court observed, "the Courts and legislative bodies have almost universally recognized that the 'property' or 'estate' which one acquires when he purchases a cemetery lot or a crypt is a 'qualified' property or estate." *Id.* (citing *Partridge v. First Indep. Church*, 39 Md. 631 (1874), and *Rayner v. Nugent*, 60 Md 515 (1883)). The Court asserted that this "'qualified' property or estate" "is generally referred to, even though conveyed by a deed absolute in form, as an easement, privilege, or license for the sole purpose of sepulture as long as the property remains a cemetery." *Diffendall v. Diffendall*, 239 Md. at 36.

The Court went on to observe that "the Legislature has on many occasions manifested its realization that the property right acquired in cemetery lots or crypts is an

unusual one." *Id.* at 37. For example, under the statute that exempted a cemetery lot or crypt from attachment by a creditor, the "property right" was "held by the proprietor for 'the sole purpose of sepulture and for no other,'" and could not "be alienated by sale without 'the approval of the president'" of the entity that owned the cemetery. *Id.* (quoting (Md. Code (1957), art. 23, § 164)).

At this point in its discussion of the legislative recognition of the "unusual" nature of "the property right acquired in cemetery lots or crypts," the Court made a passing reference to BR § 5-505's immediate statutory predecessor. In that reference, the Court did no more than cite the statute and state, parenthetically, that it provided "for the sale of burial grounds and the removal of interred bodies under certain circumstances." *Id.* This is far from a recognition of "the mandatory nature of the statute," as the Coalition says.[36]

---

[36] Furthermore, the statutory provision "for the removal of interred bodies under certain circumstances" suggests that BR § 5-505 does not afford the remedy that the Coalition seeks. For example, although the Coalition is circumspect about what ought to be done with the property, it does not seem to want the interred remains to be removed and reinterred elsewhere. Instead, the Coalition seems to want to have the cemetery recognized, preserved, and protected from desecration. This is a laudable goal; however, BR § 5-505(b)(2) envisions that the remains must be removed, because it states that the court "shall order that as much of the proceeds of the sale as necessary be used to pay the expenses of removing any human remains in the burial ground, buying burial lots in another burial ground, and reburying the remains[.]" When questioned about this difficulty at oral argument, counsel for the Coalition cited BR § 5-505(b)(1), which empowers a court to "pass a judgment for the sale of the burial ground on the terms and notice the court sets[.]" Counsel argued that, in empowering the court to set the "terms" of the sale, subsection (b)(1) empowers the court to allow the interred remains to stay. Yet, it is exceedingly doubtful that subsection (b)(1) could overcome the express requirement in subsection (b)(2), that the court order that the sale proceeds be used, first, to pay to disinter the remains and to reinter them elsewhere. Moreover, it is hard to see how a court could enter a judgment passing title to the buyer free of the claims of the

52

**8.** *Hickman ex rel. Hickman v. Carven*

Both the Coalition and the circuit court put great stock in one sentence in a page-long paragraph of dicta in *Hickman ex rel. Hickman v. Carven*, 366 Md. 362 (2001).

*Hickman*, like *Diffendall*, is one of the few cases that mentions BR § 5-505. Like *Diffendall*, however, *Hickman* does not involve BR § 5-505. Instead, it involves § 5-108 of the Courts & Judicial Proceedings Article ("CJP") of the Maryland Code (1974, 1998 Repl. Vol.), the statute of repose for actions for damages resulting from the defective and unsafe condition of an improvement to real property.[37]

CJP § 5-108(a) states that, in general, "no cause of action for damages accrues and a person may not seek contribution or indemnity for damages incurred when wrongful death, personal injury, or injury to real or personal property resulting from the defective and unsafe condition of an improvement to real property occurs more than 20 years after the date the entire improvement first becomes available for its intended use." In other words, under CJP § 5-108(a), a person generally cannot bring an action for damages "resulting from the defective and unsafe condition of an improvement to real property" unless the wrongful death, personal injury, or property damage occurs less than "20 years after the date the entire improvement first becomes available for its intended use."

Hickman's late husband had subdivided a farm, recorded plats, built roads and canals, installed electrical service, and granted rights of way for other utilities and roads.

---

holders of the burial lots, as § 5-505(b)(3) requires, unless the interred remains were removed.

[37] The current version of the statute is unchanged.

*Hickman ex rel. Hickman v. Carven*, 366 Md. at 364. In the process, he had allegedly removed tombstones and other evidence of a family graveyard, but had left the graves underground. *Id.* at 366. He allegedly did so because he wanted to avoid the expense associated with the disinterment of human remains and the relocation of graveyards. *Id.*

The Carvens purchased a lot on which the graveyard had allegedly been located. When they learned that their house had been constructed on a graveyard (in part through their discovery of human remains just below the surface of the earth), they brought suit, alleging fraud. *Id.* at 364-67.

Hickman defended on the ground that the Carvens' damages did not occur until more than 20 years after her late husband had "improved" the property by creating a subdivision, preparing lots and creating streets and utilities, and otherwise enhancing the value of the property. Thus, Hickman argued that the statute of repose in CJP § 5-108(a) barred the Carvens' claims. The circuit court granted Hickman's motion for summary judgment. *Id.* at 367.

On appeal, the Carvens argued that the desecration of a graveyard cannot constitute an "improvement" to property. *Id.* at 371. The Court agreed and reversed the grant of summary judgment.

The Court began its analysis by discussing earlier cases that touched on the unique status of cemeteries. Quoting a case that upheld a cemetery's right to prohibit a lot owner from installing two sculptured lions on her lot, the Court wrote:

> "A place for the burial of the dead . . . has characteristics differing from those of an ordinary tract of land. To many, it is sacred ground which should not suffer intrusion from mundane objects."

*Id.* (quoting *Abell v. Green Mount Cemetery*, 189 Md. 363, 366 (1947)).[38]

And quoting the *Diffendall* Court's explanation for the "qualified" nature of the property right in a cemetery lot or crypt, the Court wrote, "'[T]hrough the ages,'" moreover, "'all civilized peoples have considered the final resting place of their dead as hallowed and sacred ground.'" *Id.* (quoting *Diffendall v. Diffendall*, 239 Md. at 36).

The Court went on to observe that, "[i]n furtherance of that notion, the General Assembly has enacted a host of laws protective of burial grounds." *Id.* As examples, the Court cited the statutes that make it a crime to remove or attempt to remove human remains from a cemetery without the State's Attorney's permission (*id.* (citing Md. Code (1957, 2001 Repl. Vol.), art. 27, § 265))[39] and to destroy, mutilate, deface, injure, or remove any tomb, monument, gravestone, or other similar structure in a cemetery. *Id.* (citing Md. Code (1957, 2001 Repl. Vol.), art. 27, § 267).[40] The court also cited a statute

---

[38] When the *Abell* Court wrote that the "sacred ground . . . should not suffer intrusion from mundane objects," it was referring to the proprietors' obligation "to consider the sensibilities and feelings of other lot owners who may have different ideas of the appropriateness of proposed monuments and structures" and their "authority to forbid those which are clearly unseemly and improper." *Abell v. Proprietors of Green Mount Cemetery*, 189 Md. at 366. The Court enumerated some of the differences between cemetery lots and other forms of real property—specifically, that "[p]laces of burial are not for barter and sale" and that "[t]hey are expected to remain in the possession of the family of those purchasing them[.]" *Id.* at 368. On the basis of those differences, the Court rejected the lot owner's contention that the restrictions on the use of her lot "should be treated in the same manner as ordinary restrictions on the use of land and should be held invalid." *Id.* at 367-69.

[39] That statute has been recodified as § 10-402(a) of the Criminal Law Article.

[40] That statute has been recodified as § 10-404(a) of the Criminal Law Article.

that requires one to obtain a permit from the Department of Health in order to disinter a

body. *Id.* (citing Md. Code (1982, 1995 Repl. Vol.), § 4-215(e)(1) of the Health-General

Article).[41]

The Court added that the General Assembly had enacted "extensive regulations on

the use and operation of land used for burial," *id.* (citing Md. Code (1992, 1998 Repl.

Vol.), §§ 5-101 through 5-1002 of the Business Regulation Article), and had "empowered

the State's municipalities to regulate the interment of bodies and control the location and

establishment of cemeteries." *Id.* (citing Md. Code (1957, 1991 Repl. Vol.), art. 23A, §

2(b)(6)).[42]  In addition, the General Assembly had "precluded the opening of alleys,

canals, roads, or other public thoroughfares through the property of a cemetery if that

property is used for burial."  *Id.* (citing Md. Code (1992, 1998 Repl. Vol.), § 5-502(a) of

the Business Regulation Article).

At this point, the Court reached BR § 5-505.  Here is what the Court said:

> It [meaning the General Assembly] has also provided for, and perhaps
> requires, a court judgment prior to the sale of a burial ground.  Section 5-
> 505(a) of the Business Regulations Article provides that, in an action
> brought pursuant to the Maryland Rules, a court may enter a judgment for
> the sale of a burial ground if the ground has been dedicated and used for
> burial, burial lots have been sold in the burial ground and deeds executed or
> certificates issued to buyers, the ground has ceased to be used for burial,
> and it is desirable to dispose of the burial ground for another purpose.  In
> that event, if the court is satisfied that it is expedient or would be in the
> interest of the parties to sell the burial ground, the court is authorized to
> enter a judgment for the same "on the terms and notice the court sets."  *Id.*

---

[41] The current version of the statute is unchanged.

[42] That statute was repealed by Chapter 119 of the Laws of 2013.  It appears to
have been recodified in Md. Code (2013, 2017 Repl. Vol.), § 5-209(e) of the Local
Government Article.

§ 5-505(b)(1). The law requires, however, that the court order "as much of the proceeds of the sale as necessary be used to pay the expenses of removing any human remains in the burial ground, buying burial lots in another burial ground, and reburying the remains." *Id.* § 5-505(b)(2). *See also* Maryland Rule 14-401. A judgment entered under § 5-505 passes title to the burial ground free of the claims of the owners of the burial ground and the holders of burial lots. Maryland Code, Business Regulations Article, § 5-505(c). Absent such a judgment, it may well be that a deed to land that constitutes a burial ground does *not* pass title free of such claims.

*Id.* at 371-72 (emphasis in original).

This is no more than general summary of how the statute works. The hedged and equivocal statement about what the statute "perhaps requires" is far from a definitive pronouncement about some kind of statutory mandate. And that equivocal statement is mirrored by the Court's closing comment that, "absent" a judgment under BR § 5-505, "it may well be that a deed to land that constitutes a burial ground does *not* pass title free of such claims." *Id.* at 372 (emphasis in original). Taken in its entirety, the passage could be read to say, in dicta, that one is "perhaps require[d]" to obtain a judgment under BR § 5-505 if one hopes to sell certain kinds of burial grounds for another purpose, because otherwise "it may well be" that a deed will not pass title "free of the claims of the owners of the burial ground and the holders of burial lots." *Id.*[43]

---

[43] As in *Diffendall*, moreover, the Court recognized that a court's mandatory obligation to order that "as much of the proceeds of the sale as necessary be used to pay the expenses of removing any human remains in the burial ground, buying burial lots in another burial ground, and reburying the remains[.]" BR § 5-505(a). As previously stated, the requirement that the remains be removed and reburied elsewhere suggests that BR § 5-505 is not the remedy that the Coalition seeks. *See supra* n.36.

In any event, the precise meaning of BR § 5-505 was ancillary to the Court's central point, which was that the extensive statutory regulation of cemeteries, of which BR § 5-505 is but one example, supports the conclusion that the desecration of a cemetery is not an "improvement" within the meaning of CJP § 5-108(a). *Hickman ex rel. Hickman v. Carven*, 366 Md. at 372-73. Fairly read, the carefully couched dicta in *Hickman* does not hold, say, or even imply that BR § 5-505 imposes a mandatory obligation on a person who intends to sell certain types of burial grounds "for another purpose."[44]

### D. "May" Does Not Mean "Must"

On the basis of the foregoing discussion, we reject the Coalition's contention that BR § 5-505 is an exception to a common-law prohibition against the sale of cemeteries and, thus, that HOC must comply with BR § 5-505 if it sells parcel 175.

There was, in fact, no general common-law prohibition against the sale of cemeteries. The common law largely ignored the subject of cemeteries: in England, cemeteries were governed by the ecclesiastical or religious courts, not by the common-law courts.

---

[44] A case similar to *Hickman* is *Rhee v. Highland Development Corp.*, 182 Md. App. 516 (2008). In that case, a residential real estate developer was alleged to have removed the headstones from an abandoned cemetery in order to conceal its existence. *Id.* at 521. Even though the plaintiff-homeowners were not in privity of contract with the developer, this Court held that the homebuyers could assert a claim for fraudulent concealment against the developer. *Id.* at 539-40. In discussing the materiality of the information that the developer concealed, this Court quoted the broad language in *Hickman* (and *Abell*) concerning the special status of cemeteries. *Id.* at 540. In addition, this Court mentioned the criminal statutes pertaining to the removal of human remains and funerary objects. *Id.* at 541-42. The *Rhee* Court did not mention BR § 5-505.

The authorities cited by the Coalition do not support the contention that the common law prohibited the sale of cemeteries. The Coalition's lead case, *Beatty v. Kurtz*, 27 U.S. (2 Pet.) 566 (1829), concerns the powers of the courts of equity—the historical rivals of the common-law courts. *Beatty v. Kurtz* holds that a court of equity will aid the grantees of a cemetery, even if the grant has not been consummated, and will protect the grantees against trespass. *Id.* at 584-85. The case has nothing to do with the common law or with a general common-law prohibition against the sale of cemeteries.

*Partridge v. First Independent Church*, 39 Md. 631 (1874), the first case to interpret BR § 5-505's statutory predecessor, strongly implies that the sale of a burial ground can occur without compliance with the statute. In that case, the Court considered what might occur if a burial ground were sold for purposes of "gain or convenience" or "gain or caprice," which would not satisfy the terms of BR § 5-505's statutory predecessor. *Id.* at 639. Because it saw fit to entertain what might occur in those circumstances, the Court clearly did not believe that the statute prohibited such a sale.

Contrary to the Coalition's contention, the original statutory language (since repealed) did not state that it was "necessary" to obtain court approval for the sale of a burial ground. Chapter 211 of the Laws of 1868; Archives of Maryland, Vol. 142, Pages 2706-07. Nor did the Court endorse that interpretation in *Reed v. Stouffer*, 56 Md. 236 (1881). The 1868 statute stated that a court could not enter an order allowing the ground to pass free of certain claims unless the proponent of the sale demonstrated that the sale was "necessary." If the proponent of the sale failed to demonstrate that the sale was "necessary," a sale could still occur, but the ground would remain subject to the claims of

the lot holders and the owner. In those circumstances, the obstacle to the sale would not be the failure to comply with the statute, but the buyer's likely unwillingness to take the property subject to the claims of the lot holders. And, in any event, since 1888, the statute has empowered courts to enter orders passing title free of the claims of the lot holders and the owners upon proof that it merely would be expedient or in the interest of the parties to sell the ground, and without proof that the sale is strictly "necessary."

*Rayner v. Nugent*, 60 Md 515 (1883), uncited by any of the parties, refutes the Coalition's contention that the common law prohibited the sale of a burial ground. In that case, the Court upheld the validity of the sale of a cemetery that occurred in 1867, before the enactment of BR § 5-505's statutory predecessor. The Court could not possibly have reached its conclusion in that case if the common law prohibited the sale of a burial ground, as the Coalition asserts. To the contrary, the Court recognized that the statute, "furnished additional facilities" for the sale of a burial ground—i.e., facilities in addition to those that already existed. *Id.* at 520. Those "additional facilities," if employed, yielded the benefit of a judgment that quieted title to the ground by extinguishing the claims of the owner and the lot holders.

The expansive language in some cases about the special status of cemeteries does not support the Coalition's position. Read in context, those cases, which do not interpret or apply BR § 5-505 or its predecessors, say only that the rights of a lot holder in a cemetery are different from, and in some cases far less extensive than, ordinary property rights. When the Court held that a right in a burial crypt is not "property" subject to attachment by a creditor (*Diffendall v. Diffendall*, 239 Md. 32, 38 (1965)), it did not hold

that the proponent of the sale of a burial ground for another purpose must adhere to BR § 5-505.[45]

Nor does the equivocal dicta in *Hickman ex rel. Hickman v. Carven*, 366 Md. 362 (2001), support the Coalition's position. To say that the statute "perhaps requires [] a court judgment" (*id.* at 371) is to flag an issue without deciding it. More telling, in our view, is the *Hickman* Court's concluding comment, that, "[a]bsent such a judgment, it may well be that a deed to land that constitutes a burial ground does *not* pass title free of such claims" (i.e., the claims of "the owners of the burial ground and the holders of burial lots"). *Id.* at 372. (Emphasis in original.)

Because of the need for a detailed explanation of why the Coalition's several contentions are incorrect, we have spent more time talking about what BR § 5-505 does not mean than about what it does mean. Nonetheless, we think that the meaning of "may" in BR § 5-505(a) is clear.

As we said at the outset of this opinion, the statute creates a mechanism by which certain kinds of burial grounds—specifically, those in which the ground has been dedicated and used for burial and burial lots have been sold and deeds executed or certificates issued to buyers of the lots—may be sold free of the claims of the lot holders

---

[45] The Coalition cites two out-of-state cases that contain similarly broad language about reverence for burial grounds. Obviously, neither case concerns BR § 5-505. Nor do the cases support the Coalition's overall position. In *United States v. Sixty Acres, More or Less*, 28 F. Supp. 368, 374 (E.D. Ill. 1939), the court held that the government could use its power of eminent domain to condemn a cemetery. In *Bessemer Land & Improvement Co. v. Jenkins*, 18 So. 565 (Ala. 1895), the court reversed a money judgment in favor of a parent who claimed that his child's body had been wrongfully disinterred.

61

and the owner. We base this interpretation on the plain language of the statute, which authorizes a person to obtain a judgment extinguishing the claims of the lot holders and the owner, but contains nothing to require a person to do so. No amount of judicial alchemy will transmute this statutory authorization into a statutory mandate.

Although there is little direct authority about what BR § 5-505 means, we have found one source that confirms our interpretation: in discussions about the predecessor of Rule 14-401, which implements BR § 5-505, a member of the Court of Appeals Standing Committee on Rules of Practice and Procedure explained that "the purpose of this Code section and corresponding rules is to assure clear title for the purchaser." Minutes of Court of Appeals Standing Committee on Rules of Practice and Procedure, Sept. 14-15, 1984, at 102.[46] In other words, BR § 5-505 is, as we have said, a quiet-title statute.

Under our interpretation, if the proponent of the sale does not invoke BR § 5-505, the sale can still occur, but the buyer will take the property subject to the claims of the lot holders. Thus, the sale can occur even without compliance with BR § 5-505 if the

---

[46] The pertinent portion of the minutes reads as follows:

> Mr. Gibson [i.e., Professor Larry S. Gibson] questioned why the rule is tied to sale for another purpose, and does not cover any disposition for another purpose. Ms. Ogletree [i.e., Anne C. Ogletree] responded that the purpose of this Code section and corresponding rules is to assure clear title for the purchaser.

proponent of the sale can find a buyer who is, for some reason, willing to take the burial ground with a cloud on the title.[47]

As applied to this case, our interpretation means that HOC is not required to comply with BR § 5-505 before it sells parcel 175 for another purpose. A legal consequence of the failure to comply with BR § 5-505 is that a purchaser will take the property subject to the claims of the lot holders. The circuit court erred in concluding otherwise.

CONCLUSION

We do not hold that the Coalition and its members have no remedy for the desecration of the graves of those interred in the Moses Cemetery. We hold only that BR § 5-505 does not compel HOC to seek court approval for the sale of parcel 175. If HOC can find a potential buyer that is willing to take the property subject to the rights of the holders of the burial lots, HOC can sell the property without court approval, but the lot holders' rights will not have been extinguished by a court order.

Our decision should not be taken as a comment on the wisdom or rectitude of HOC's decision to sell this burial ground to an investor. It is not our province to express a view on that subject. We note only that the commissioners of HOC are nominated by the County Executive and approved by the County Council. The commissioners are

---

[47] What a buyer can do to alter the property is another question. Montgomery County imposes restrictions on the ability to develop or redevelop properties that contain burial sites. *See* Montgomery County Code, Division 50.4, § 4.3(M).

63

answerable to those elected officials; and the elected officials are, in turn, answerable to the registered voters of Montgomery County.

We end with the words of a nineteenth century jurist, who concluded that he lacked the power to enjoin the sale of a cemetery and the removal of the interred remains:

> [M]y sympathies were strongly enlisted in behalf of these complainants, vindicating the repose of the bones of their kindred. But I cannot shut my eyes to the clear light of the law as applicable to the case.

*Windt v. German Reformed Church*, 4 Sanford's Equity Reporter 471, 476, 7 N.Y. Ch. Ann. 1175 (1847).

**JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY REVERSED; COSTS TO BE PAID BY APPELLEES.**